CARTER C. WHITE – 164149
KING HALL CIVIL RIGHTS CLINIC
U.C. Davis School of Law
One Shields Avenue, Bldg. TB-30
Davis, California 95616-8821
Telephone: (530) 752-5440
Facsimile: (530) 752-5788
Email: ccwhite@ucdavis.edu

MICHAEL W. BIEN – 096891
GAY CROSTHWAIT GRUNFELD – 121944
MICHAEL FREEDMAN – 262850
BENJAMIN BIEN-KAHN – 267933
ROSEN BIEN GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830
Facsimile: (415) 433-7104
Email: mbien@rbgg.com
ggrunfeld@rbgg.com
mfreedman@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| DERRIL HEDRICK, DALE ROBINSON, KATHY LINDSEY, MARTIN C. CANADA, DARRY TYRONE PARKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JAMES GRANT, as Sheriff of Yuba County; Lieutenant FRED J. ASBY, as Yuba County Jailer; JAMES PHARRIS, ROY LANDERMAN, DOUG WALTZ, HAROLD J. "SAM" SPERBEK, JAMES MARTIN, as members of the YUBA COUNTY BOARD OF SUPERVISORS,<br><br>Defendants. | Case No. 2:76-CV-00162-EFB<br><br>**[PROPOSED] ORDER GRANTING JOINT MOTION FOR FINAL APPROVAL OF AMENDED CONSENT DECREE**<br><br>Judge: Hon. Edmund F. Brennan<br>Date: Jan. 23, 2019<br>Time: 10:00 a.m.<br>Crtrm.: 8, 13th Floor |

The Parties are currently bound by a consent decree approved by the Court in May 1979. In July 1976, the Court certified a class consisting of all "all persons incarcerated within the Yuba County Jail." The Parties now wish to amend the current Consent Decree. The Parties have met and conferred extensively to review and discuss claims relating to the conditions of confinement at the Yuba County Jail and access to its programs, services and activities under the Americans with Disabilities Act and changes to the existing Consent Decree. The process has included six days of face-to-face meetings overseen by Judge Kendall Newman. Based on a review of the entire record, including the matters set forth in the Stipulated Amended Consent Decree, and considering the procedural and factual circumstances of this case, the Court finds good cause to enter the following Order:

1.      The Court accepts and adopts the statements, terms, and conditions set forth in the Parties' stipulated Amended Consent Decree, a true and correct copy of which is attached as Exhibit A;

2.      Pursuant to Federal Rule of Civil Procedure 23(e)(2), the Court finds that the Amended Consent Decree is fair, reasonable, and adequate and has considered the following:

      a.      Class counsel has adequately represented the class;

      b.      The Amended Consent Decree was negotiated in good faith;

      c.      The relief provided is adequate considering the costs, risk and delay of trial and appeal; the effectiveness of the proposed relief to the class and the method of processing class-member claims; the terms of any proposed award of attorney fees; and the agreements reached by the parties; and

      d.      The Amended Consent Decree treats class members equitably relative to each other.

3.      The Court further finds that the following factors support the fairness, reasonableness, and adequacy of the Amended Consent Decree:

      a.      The Amended Consent Decree provides adequate relief to the class, especially in light of the risks, expense, complexity and likely duration of further litigation

[3338022.1]

to enforce the original Consent Decree and to obtain additional rights on behalf of the class;

      b.      The parties entered into the Amended Consent Decree only after engaging in significant informal discovery and Plaintiffs' thorough investigation of the conditions in the Jail;

      c.      The Amended Consent Decree was not the product of fraud or collusion among the negotiating parties. The Amended Consent Decree was reached after significant, arm's-length negotiations between the parties, including six all-day, in-person settlement conferences, all of which were supervised by Magistrate Judge Newman, dozens of telephone conferences, some of which were supervised by Magistrate Judge Newman, a tour of the Jail with Magistrate Judge Newman, and the exchange of at least eighteen different revisions of the Amended Consent Decree. The parties did not negotiate the attorneys' fees provisions of the Amended Consent Decree until after they had agreed on all of the substantive provisions of the Decree;

      d.      Plaintiffs' counsel who are experienced in class action litigation believe the Amended Consent Decree is fair, reasonable, and adequate;

      e.      After the parties, pursuant to the November 7, 2018 order of this Court, provided effective notice of the Amended Consent Decree to the class and a period of fifty-two days to file objections with the Court, no class members objected to the Amended Consent Decree;

      f.      The two side agreements reached by the parties—by which (1) the parties agreed that if the Court grants final approval to the Amended Consent Decree, Plaintiffs would not renew or refile their Motion for Leave to File Supplemental Civil Class Action Complaint for Declaratory and Injunctive Relief Pursuant to Fed. R. Civ. P. 15(d) or to otherwise pursue a complaint for violations of the Americans with Disabilities Act relating to matters addressed in the Amended Consent Decree, and (2) the parties agreed that they would not attach the third-party medical provider's protocols for substance withdrawal as exhibits to the Amended Consent Decree due to their proprietary

nature—have no bearing on the fairness, reasonableness, and adequacy of the Amended Consent Decree; and

g. The Amended Consent Decree, which only provides for injunctive relief and does not provide for any monetary damages to class members, treats all of the class members the same.

4. Under the circumstances presented in this matter, the Court finds such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal rights, and is the least intrusive means necessary to correct the violation of the Federal rights.

4. This Court has jurisdiction over the subject matter in this litigation and over all the parties to this action, including all members of Plaintiffs' class.

5. This case shall remain open and the Court shall retain jurisdiction to enforce the terms of the Amended Consent Decree for the terms and under the conditions set forth in section XX – Termination of the Amended Consent Decree. Once the matter is terminated under that provision, this case shall be ordered dismissed, with prejudice.

6. This Order shall apply to Defendants, their agents, employees, and successors in office.

**IT IS SO ORDERED.**

DATED: January 30 , 2019

_____
EDMUND F. BRENNAN
United States Magistrate Judge

[3338022.1]

# EXHIBIT A

CARTER C. WHITE – 164149
KING HALL CIVIL RIGHTS CLINIC
U.C. Davis School of Law
One Shields Avenue, Bldg. TB-30
Davis, California  95616-8821
Telephone:    (530) 752-5440
Facsimile:     (530) 752-5788
Email:          ccwhite@ucdavis.edu

MICHAEL W. BIEN – 096891
GAY CROSTHWAIT GRUNFELD – 121944
MICHAEL FREEDMAN – 262850
BENJAMIN BIEN-KAHN – 267933
ROSEN BIEN GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:   (415) 433-6830
Facsimile:    (415) 433-7104
Email:         mbien@rbgg.com
                   ggrunfeld@rbgg.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| DERRIL HEDRICK, DALE ROBINSON, KATHY LINDSEY, MARTIN C. CANADA, DARRY TYRONE PARKER, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>         v.<br><br>JAMES GRANT, as Sheriff of Yuba County; Lieutenant FRED J. ASBY, as Yuba County Jailer; JAMES PHARRIS, ROY LANDERMAN, DOUG WALTZ, HAROLD J. "SAM" SPERBEK, JAMES MARTIN, as members of the YUBA COUNTY BOARD OF SUPERVISORS,<br><br>    Defendants. | Case No. 2:76-CV-00162-JAM-EFB<br><br>**AMENDED CONSENT DECREE**<br><br>Judge:  Hon. Edmund F. Brennan<br><br>Trial Date:      None Set |

[3284355.3]

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................. 1

II.     DEFINITION OF TERMS ................................................................... 3

III.    EXERCISE AND RECREATION ......................................................... 5

IV.     STAFFING ........................................................................................... 8

        A.      Health Personnel .................................................................... 8

                1.      Physician ..................................................................... 10

                2.      Nurse Practitioner (NP) and/or Physician's Assistant (PA) ............... 10

                3.      Registered Nurse (RN) ................................................. 10

                4.      Licensed Vocational Nurse (LVN) .............................. 10

                5.      Dentist ........................................................................ 11

                6.      Psychiatrist ................................................................. 11

                7.      Licensed Clinical Social Worker (LCSW) and/or Marriage and Family Therapist (MFT) ................ 11

                8.      Private Health Care .................................................... 11

                9.      Medical Decision-making ............................................ 12

                10.     Specialists and Consultants ......................................... 12

        B.      Custody Staff ......................................................................... 12

V.      MEDICAL AND MENTAL HEALTH CARE ....................................... 13

        A.      Medical and Mental Health Procedures for New Arrestees ......................... 13

        B.      Access to Medical and Mental Health Care .................................. 16

                1.      Initial Health Assessment ............................................ 16

                        (a)     Receiving Screening Form ................................. 17

                        (b)     Medical History Interview ................................. 17

                        (c)     Physical Examination ........................................ 18

                        (d)     Screening ......................................................... 18

                        (e)     Tests ................................................................ 18

                        (f)     Dental Assessment ............................................ 18

i

AMENDED CONSENT DECREE

(g)     Follow-Up Care .................................................................... 19

(h)     Twelve-month Health Care Evaluation.................................... 19

(i)     Use of PHQ-9 Form ............................................................... 19

2.     Continuity of Care ....................................................................... 19

3.     Treatment for Infectious Diseases and Chronic Conditions .............. 19

4.     Continuity of Community-Prescribed Medications .......................... 20

5.     Medical Assistance for Intoxicated Inmates and/or Inmates in Withdrawal ................................................................................. 21

6.     Mental Health Services ................................................................. 22

(a)     Telepsychiatry ....................................................................... 24

7.     Women's Health........................................................................... 26

8.     Dental Services ............................................................................ 27

9.     Sick Call ..................................................................................... 27

10.     Emergency Care and Hospitalization............................................... 29

11.     Recordkeeping ............................................................................. 31

12.     Distribution and Storage of Prescription Drugs ............................... 32

13.     Medical and Mental Health Training for Correctional Officers ........ 32

14.     Inmate's Rights............................................................................ 33

15.     Effective Communication for Inmates with Disabilities and Limited English Proficiency.......................................................... 34

C.     Suicide Prevention ............................................................................... 35

D.     Inmates with Disabilities ...................................................................... 35

1.     ADA Coordinator ........................................................................ 36

2.     ADA Compliance Plan.................................................................. 36

3.     Reasonable Accommodations ........................................................ 37

VI.     ENVIRONMENTAL HEALTH AND SAFETY CONDITIONS ........................... 38

A.     Suicide Hazards .................................................................................. 38

B.     Housing For Inmates with Mental Illnesses or Who Are at Risk of Suicide ................................................................................................ 39

AMENDED CONSENT DECREE

[3284355.3]

C. Safety Cells .................................................................................. 40

D. "Step-Down" Cell ........................................................................ 43

E. Temperature, Lighting and Insect Control ................................. 44

F. Fire Safety ................................................................................... 45

G. Maintaining Habitable Accommodations .................................... 45

H. Environmental Health Evaluations .............................................. 45

I. Inmate's Personal Hygiene .......................................................... 45

J. Food ............................................................................................. 46

K. Evaluation ................................................................................... 46

VII. VISITATION ......................................................................................... 47

VIII. DUE PROCESS IN DISCIPLINE ......................................................... 47

A. Effective Communication for Inmates with Disabilities and Limited English Proficiency ....................................................... 47

B. Major and Minor Violations ........................................................ 48

C. Disciplinary Measures ................................................................. 48

D. Disciplinary Procedures .............................................................. 49

E. Reporting of Disciplinary Actions .............................................. 51

F. Special Consideration .................................................................. 52

IX. ADMINISTRATIVE SEGREGATION AND SEGREGATED HOUSING ........... 52

A. Out-Of-Cell Time and Other Recreation and Treatment for Prisoners in Segregated Housing ................................................. 54

X. INMATE GRIEVANCE PROCEDURE .................................................. 55

A. Purpose and Definitions .............................................................. 56

1. Statement of Purpose ....................................................... 56

2. Grievance Defined ............................................................ 56

B. Jail Grievance Procedure ............................................................. 56

C. Grievance Appeals ....................................................................... 57

D. Records ........................................................................................ 58

XI. ACCESS TO LEGAL MATERIALS ..................................................... 58

AMENDED CONSENT DECREE

[3284355.3]

XII.    ACCESS TO COURTS ................................................................................ 60

XIII.   INMATE EDUCATION AND VOCATIONAL TRAINING PROGRAM ............ 61

        A.    Education and Vocational Training Plan.......................................... 61

        B.    Minimum Requirements of the Inmate Education and Vocational
              Training Plan ................................................................................. 61

XIV.    COMPLIANCE WITH TITLE 15 OF THE CALIFORNIA
        ADMINISTRATIVE CODE ................................................................... 62

XV.     MONITORING ..................................................................................... 62

XVI.    MISCELLANEOUS RELIEF .................................................................... 64

XVII.   PROCESS FOR APPROVAL OF AMENDED CONSENT DECREE.................. 64

        A.    Consent to Proceed Before Currently-Assigned Magistrate Judge ............... 64

        B.    Court Approval ............................................................................... 65

        C.    Preliminary Approval by the District Court .................................... 65

        D.    Notice to Class of Amended Consent Decree Pursuant to Federal Rule
              of Civil Procedure 23(e) ................................................................ 65

        E.    Inmate Objections.......................................................................... 66

        F.    Fairness Hearing ............................................................................ 66

XVIII.  ATTORNEYS' FEES, COSTS, AND EXPENSES.......................................... 66

        A.    Past Attorneys' Fees, Expenses, and Costs for Monitoring and
              Enforcing Consent Decree and Negotiating Amended Consent Decree....... 66

        B.    Future Attorneys' Fees, Expenses and Costs for Monitoring and
              Enforcing Amended Consent Decree .............................................. 67

XIX.    RESERVATION OF JURISDICTION AND ENFORCEMENT ........................... 68

XX.     TERMINATION ................................................................................... 70

[PROPOSED] ORDER................................................................................... 72

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[3284355.3]

AMENDED CONSENT DECREE

I.      **INTRODUCTION**

On March 24, 1976 plaintiffs DERRIL HEDRICK, DALE ROBINSON, KATHY LINDSEY, MARTIN C. CANADA, and DARRY TYRONE PARKER filed the Complaint herein on their own behalf and on behalf of all persons similarly situated alleging that the conditions of confinement within the Yuba County Jail violated rights secured by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the laws and Constitution of the State of California. On April 14, 1976, defendants the Sheriff of Yuba County, the Yuba County Jailer, and members of the Yuba County Board of Supervisors ("Defendants"),[1] served their Answer denying material allegations of the Complaint.

On June 18, 1976, plaintiffs filed a motion for a preliminary injunction as to their First Claim For Relief – Lack of Exercise and Recreation, a motion for partial summary judgment as to their Seventh Claim For Relief – Access to Legal Materials, a motion for partial summary judgment as to that portion of their Ninth Claim For Relief dealing with female participation in the Yuba County Jail's trusty program, and a motion for class certification.

In accordance with Rule 23(b)(2) of the Federal Rules of Civil Procedure, a class was certified and defined to include all persons incarcerated within the Yuba County Jail during the pendency of this action. Pursuant to the Order of this Court, filed on July 23, 1976, members of the class have received notice of this lawsuit.

On November 12, 1976, the Court signed and filed its Findings of Fact, Conclusions

---

[1] Rule 25(d) of the Federal Rules of Civil Procedure provides that when a public officer being sued in his or her official capacity is replaced in his or her position, the officer's successor is automatically substituted as a Defendant in the case. *See* Fed. R. Civ. P. 25(d). Wendell Anderson has replaced James Grant as Sheriff of Yuba County and therefore is a Defendant in this case. Captain Brandon Barnes has replaced Lieutenant Fred J. Asby as Yuba County Jailer and therefore is a Defendant in this case. Andy Vasquez, Jr., Mike Leahy, Doug Lofton, Gary Bradford, and Randy Fletcher have replaced James Pharris, Roy Landerman, Doug Waltz, Harold J. "Sam" Sperbek, and James Martin as members of the Yuba County Board of Supervisors and therefore are Defendants in this case.

AMENDED CONSENT DECREE

[3284355.3]

1   of Law, and Order granting plaintiffs' motion for a preliminary injunction and both of their

2   motions for partial summary judgment.  An Order particularizing portions of the relief for

3   deep felony inmates was signed on January 18, 1977, and a second Order fully

4   incorporating women inmates into the Jail's trusty program was signed the following day.

5   On May 18, 1977, the Court signed an Order requiring certain records to be kept so that

6   compliance with all previously issued orders could be monitored.

7         In May 1979, the Court entered a consent decree ("the Consent Decree") covering

8   certain aspects of the Jail's operations, including medical and mental health care, staffing,

9   grievances, and exercise and recreation, and providing for monitoring Jail conditions.

10        In May 2013, Defendants filed a motion to terminate the Consent Decree pursuant

11  to the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(b)(1) & (b)(2).  Dkt.

12  Nos. 95 & 96.  On April 2, 2014, the Court issued an order denying the County's motion to

13  terminate the Consent Decree, Dkt. No. 135, which was affirmed by the Ninth Circuit.

14  *Hedrick v. Grant*, 648 Fed. App'x. 715 (9th Cir. 2016).

15        On October 24, 2016, in response to numerous claimed ongoing violations of the

16  Consent Decree and the United States Constitution, Plaintiffs filed a Motion to Enforce the

17  Consent Decree and for Further Remedial Orders. On January 11, 2017 Defendants filed

18  their Opposition to Plaintiffs Motion to Enforce, and a hearing on said motion occurred on

19  January 26, 21017.

20        On November 16, 2016, Plaintiffs filed a Motion for Leave to File a Supplemental

21  Civil Class Action Complaint in order to address alleged violations of the Americans with

22  Disabilities Act ("ADA"), 42 U.S.C. § 12102, and related federal and state laws.

23        On May 5, 2017, June 29, 2017, August 18, 2017, November 8, 2017, January 5,

24  2018, and March 2, 2018 the parties participated in a settlement conference and agreed to

25  enter into this Amended Consent Decree.

26        In agreeing to the issuance of this Amended Consent Decree, defendants make no

27  admission of the allegations of the Complaint and deny that the conditions of confinement

28

[3284355.3]

1   within the Yuba County Jail are in any way illegal.  Nothing in this Amended Consent

2   Decree can be used to argue or attempt to establish that the Jail is operated in violation of

3   applicable standards, regulations or the law.  Defendants enter into this Amended Consent

4   Decree in order to avoid the burdens of litigation and in order to re-affirm their

5   commitment to full compliance with the law.

6          The parties have mutually agreed to entry of this Amended Consent Decree.  It is

7   the intent of the parties that this Amended Consent Decree be binding among them

8   immediately upon signature by the attorneys for all parties.  Implementation of the

9   Amended Consent Decree shall begin immediately and shall be completed no later than

10   nine (9) months from the date this Agreement is finally approved by the Court, except as

11   otherwise specified herein.  This Agreement is intended to terminate as set forth in section

12   XX.

13   **II.    DEFINITION OF TERMS**

14          All terms used herein shall be interpreted liberally in order to reflect and effectuate

15   the desire of all parties to operate the Yuba County Jail in full compliance with applicable

16   state and federal law.  All language shall be construed in its normal and customary usage.

17   In addition, the following provisions shall govern the construction of the terms set forth

18   herein.

19          1.     Jail – The Yuba County Jail located in the County Courthouse, 215 5th

20   Street, Marysville, California.

21          2.     Administrative Segregation – Those portions of the Jail used to house

22   inmates pursuant to Title 15 sec. 1053.

23          3.     Disability or Disabilities – Any physical or mental impairment that

24   substantially limits one or more major life activities, including, but not limited to, any

25   impairment that substantially limits mobility, vision, hearing, speaking, manual dexterity,

26   or ability to understand communications.

27          4.     Exercise Roof – The fenced-in area on the roof of the County Courthouse

28

[3284355.3]

1 | designed as an inmate exercise facility.

2 |      5.    <u>Exercise Yard</u> – The exercise area in the New Jail which is adjacent to the D,

3 | E, and F pods.

4 |      6.    <u>Inmate</u> – A person incarcerated within the Yuba County Jail, including pre-

5 | trial detainees, sentenced inmates, and inmates held in cooperation with other agencies

6 | including Immigration and Customs Enforcement.

7 |      7.    <u>Correctional Officer</u> – A uniformed employee of Yuba County and the Yuba

8 | County Sheriff's Department who works in the Jail and who is a peace officer pursuant to

9 | California Penal Code § 830.1(c).

10 |      8.    <u>Jail Supervisor</u> – The Jail Lieutenant employed by the Yuba County Sheriff's

11 | Department in the Jail who is directly responsible for the administration of the Jail.

12 |      9.    <u>Jail Commander</u> – The Captain of the Yuba County Sheriff's Department

13 | assigned to oversee the operations of the Yuba County Jail.

14 |      10.    <u>Maintain</u> – Make available now and in the future in a workable and usable

15 | condition, promptly replace when broken or missing, promptly repair when inoperative or

16 | malfunctioning, and continue in existence.

17 |      11.    <u>Qualified Medical Professionals</u> – These persons include physicians,

18 | physician assistants, nurse practitioners, registered nurses, and/or licensed vocational

19 | nurses and others by virtue of their education, credentials, and experience are permitted by

20 | law to evaluate and care for patients.

21 |      12.    <u>Qualified Mental Health Professionals</u> – These persons include psychiatrists,

22 | psychologists, licensed clinical social workers, and marriage and family therapists.

23 |      13.    <u>Recreation Aid</u>—A person employed at the jail responsible for, among other

24 | things, insuring compliance with required exercise and recreation, developing and

25 | implementing appropriate recreation programs, supervising the maintenance of recreation

26 | equipment, providing recreation equipment for inmates who request it, and monitoring and

27 | updating the Jail library.

28 |

[3284355.3]

14.     <u>Segregated Housing</u> – Housing locations in the Jail in which inmates spend more than 21 hours per day locked in their cell.  At the time the parties entered into this Amended Consent Decree, the Segregated Housing units in the Jail were A-Pod, Q-1, Q-2, Q-3, S-Tank and the medical cells.

15.     <u>Class Counsel</u> – The law firm of Rosen Bien Galvan & Grunfeld, LLP, and the University of California at Davis School of Law, King Hall Civil Rights Clinic.

## III.     EXERCISE AND RECREATION

All inmates of the Jail shall be offered adequate access to exercise and recreation, including regularly scheduled periods of outdoor exercise and recreation.

The Jail shall maintain both the Exercise Yard and the Exercise Roof at the Jail in adequate condition for regular use for inmate exercise and recreation.  The Jail shall offer exercise to inmates on both the Exercise Yard and Exercise Roof seven days per week, continuously from 5 a.m. to 11 p.m. each day.  Within ninety (90) days of signing this Amended Consent Decree, Defendants must complete all necessary steps, including, but not limited to, renovating the Exercise Roof by installing lights and cameras, to ensure that exercise can be offered to inmates on Exercise Roof continuously from 5 a.m. to 11 p.m., seven days per week.

Defendants shall provide adequate staffing to ensure that exercise can be offered to inmates on the Exercise Yard and Exercise Roof continuously from 5 a.m. to 11 p.m. and that inmates are appropriately supervised in each area.

At a minimum, all inmates shall be offered the use of the Exercise Yard or the Exercise Roof at least one (1) hour a day, five (5) days a week exclusive of time spent in transit to and from the Exercise Yard or Exercise Roof.  Defendants shall offer at least two (2) additional hours per week of use of the Exercise Yard or the Exercise Roof to inmates in Segregated Housing.

In order to meet the requirements regarding minimum opportunities for exercise, Defendants shall offer exercise to inmates in the Jail pursuant to the exercise schedule

[3284355.3]

1  attached as **Exhibit A**.  The schedule for outdoor exercise shall be posted in the booking

2  area and in all housing units.

3  The Jail shall complete and maintain the exercise log attached as **Exhibit B**.  Copies

4  of the exercise logs will be produced to Class Counsel on a quarterly basis.  If, for any

5  reason, Defendants do not offer exercise to an "Area" set forth on **Exhibit B** on a given

6  day, Defendants shall indicate on the exercise log the reason why exercise was not offered

7  to the Area that day.

8  Within 180  days of signing this Amended Consent Decree, Defendants must

9  complete all necessary steps to divide the Exercise Yard into two separate areas and shall

10  meet and confer with Plaintiffs' counsel regarding the same.  One area shall occupy

11  approximately two-thirds of the Exercise Yard, while the other area shall occupy

12  approximately one-third of the Exercise Yard.  The structure used to divide the Exercise

13  Yard shall be permanent.  The design of the divider shall have access doors between the

14  two sides that are as large as feasible under the circumstances if possible.  The purpose of

15  creating the ability to divide the Exercise Yard into two separate areas is so that

16  Defendants can simultaneously offer exercise in the two sections of the Exercise Yard to

17  inmates from different housing units or who are otherwise incompatible because of their

18  classification (e.g., inmates from different cells in Segregated Housing).  When the doors

19  to the structure dividing the Exercise Yard are closed, Defendants shall not offer exercise

20  to more than six (6) prisoners in the smaller section of the Exercise Yard.

21  Defendants shall continue to undertake good faith efforts to expand access to

22  exercise and recreation to meet the needs of the Jail population, including looking at

23  options for additional funding relating to inmates' access to exercise and recreation.

24  Within twelve (12) months after signing of this Amended Consent Decree and

25  annually thereafter, Defendants shall conduct an evaluation of whether they are complying

26  with the terms of this Amended Consent Decree.  Defendants shall produce the results of

27  this evaluation to Class Counsel.

28

1       No inmate may decline an offer of exercise on behalf of another.  The Jail
2  Handbook shall be amended to make this clear.

3       All inmates shall have the option of obtaining a sweatshirt for use when exercising
4  outdoors.  When weather conditions preclude use of the Exercise Roof, Defendants shall
5  provide additional out-of-cell time, to the extent possible, for inmates in Segregated
6  Housing.

7       Defendants shall have an adequate amount of exercise and recreation equipment
8  available for use by inmates, including by inmates with disabilities.  At a minimum, this
9  equipment shall include:  two basketball backboards with rims and nets, basketballs, a
10  volleyball net and balls, two body-weight resistance exercise stations comparable to those
11  installed as of January 2017, a ping pong table with an appropriate number of paddles and
12  balls, playing cards, board or parlor games, and a stationary exercise bicycle.  Defendants
13  shall also have the following additional equipment on the female side of the Jail:  a
14  stationary exercise bicycle, a sewing machine, playing cards, and board or parlor games.
15  Defendants shall evaluate the exercise equipment on a yearly basis and shall maintain it as
16  necessary.

17       Recreational movies shall be shown on a regular basis.

18       A Jail library of at least three hundred (300) volumes, at least fifty (50) of which
19  shall be in Spanish, shall be maintained within the Jail.  The Jail shall make reasonable
20  efforts to rotate books into and out of the library.  Inmates shall be allowed to borrow
21  books at least twice weekly.  On a yearly basis, the Recreation Aid shall determine
22  whether there are a sufficient number of books in the Jail's library, and whether the books
23  are appropriate for the educational and recreation needs of inmates.  The Recreation Aid
24  shall make such determinations and shall recommend an appropriate number and variety of
25  books for rotation into and out of the Jail library.  Nothing in this settlement shall be
26  construed to inhibit the Jail from reasonably excluding books that may be deemed to
27  interfere with the safety, security, order, and discipline in the Jail.

28

[3284355.3]

1   Information about how to request books shall be included in the Jail Handbook.

2   Appropriate forms for these requests shall be available in English and Spanish.  Inmates

3   may use books provided to them by friends and family, after inspection and clearance by

4   Jail staff.

5   Defendants shall maintain a telephone with volume control in each of the housing

6   areas.

7   The exercise and recreational items enumerated in this Section of the Amended

8   Consent Decree shall be the minimum permitted.  Defendants shall make good faith

9   attempts to provide and maintain additional exercise and recreation equipment.  These

10   good faith attempts shall include the use of funding available from state and federal

11   sources.

12   Once a year, the Jail Supervisor, or his or her designee, shall take an inventory of

13   recreation and exercise equipment.  Said inventory shall state whether each item is present

14   within the Jail and in working order.  It shall also list items that were purchased in the last

15   year and/or that have been ordered but not yet received.

16   **IV.   STAFFING**

17   Defendants shall employ sufficient staff to meet their obligations under the United

18   Stated Constitution, Title 15 of the California Code of Regulations, and this Amended

19   Consent Decree.  However, except as explicitly stated in this Agreement, nothing set forth

20   herein shall preclude Defendants from adjusting staffing levels, up or down, as may be

21   necessary to operate the Jail.

22   Staffing is assessed by the Board of State and Community Corrections (BSCC) as

23   part of its biennial inspection.  If the BSCC makes a finding that the Jail is not sufficiently

24   staffed, or the Defendants on their own make that determination, the Defendants shall

25   undertake good faith efforts to fund and fill the position(s).

26   **A.   Health Personnel**

27   To address the provision of medical and mental health services in the Jail,

28

[3284355.3]

Defendants shall prepare and maintain a Clinical Staffing Plan.  That plan shall be evaluated on a yearly basis, unless a major change in the Jail population warrants a reassessment sooner.  If it is determined additional staffing is needed, the Defendants shall in good faith seek to fund and fill the position(s).  A Physician, NP, PA, and/or RN must be physically present at the Jail twenty-four (24) hours per day, seven (7) days per week.

As of the date this Amended Consent Decree has been executed, Defendants have contracted with a third party to provide medical and mental health care to inmates at the Jail (the "third-party medical provider").  The contract has a term from September 1, 2017 to August 31, 2020.  Pursuant to the contract, the Jail will be staffed with medical and mental health care personnel as set forth in **Exhibit C**.  Defendants shall, at all times, ensure that the staffing levels set forth in **Exhibit C** are actually being satisfied. Defendants represent that, based on current conditions, the staffing levels are sufficient to meet the requirements of this Amended Consent Decree.  With respect to medical and mental health staffing, Plaintiffs may only move to enforce this Amended Consent Decree if Defendants' medical and mental health care staffing levels fall below the levels set forth in **Exhibit C**.  If Plaintiffs believe that staffing in excess of the levels set forth in **Exhibit C** is necessary to deliver constitutionally adequate care, Plaintiffs must prove that the staffing levels set forth in **Exhibit C** are resulting in constitutionally deficient care.  If a position becomes vacant, Defendants shall make good faith efforts to fill the position as soon as possible.

Pursuant to Paragraph 22(b) of the contract between Yuba County and the third-party medical provider, Yuba County must provide notice regarding its intention to reduce medical and mental health staffing below the levels set forth in **Exhibit C**.  If Yuba County provides said notice, or Defendants otherwise consider a reduction in medical or mental health staffing below the levels set forth in **Exhibit C**, Defendants must provide prompt written notice to Class Counsel within seven (7) days of such notice or consideration.

### 1. Physician

A physician will provide outpatient physical health care.  The Jail shall employ the physician as set forth in **Exhibit C** for a total of 9 hours per week.

### 2. Nurse Practitioner (NP) and/or Physician's Assistant (PA)

The Jail shall employ at least one Physician Assistant and/or Nurse Practitioner. That person shall function under agreements specific to their scope of practice with the supervision of the responsible physician in accordance with the Medical Board of California regulatory guidelines.  The Jail shall employ an NP and/or PA as set forth in **Exhibit C** for 40 hours per week, Monday – Friday.

The NP and/or PA must be specifically trained and capable of delivering limited mental health services, including, but not limited to, assessment of mental health status, suicide prevention, drug and alcohol abuse counseling and individual counseling, and must be able to evaluate environmental health conditions.

### 3. Registered Nurse (RN)

The Jail shall employ Registered Nurses who meet all licensing requirements of the State of California.  An RN must function under standardized procedures developed in accordance with California Board of Registered Nursing requirements.  All treatment is pursuant to protocol, standard procedures and/or direct physician orders by personnel licensed to carry out such functions in the State of California.

The Jail shall employ RNs as set forth in **Exhibit C** for a total of 192 hours per week.

### 4. Licensed Vocational Nurse (LVN)

LVNs must meet all licensing requirements of the State of California and shall perform duties specific to his or her scope of practice with adequate supervision by the registered nurse, nurse practitioner, physician's assistant, and/or physician.  The Jail shall employ LVNs as set forth in **Exhibit C** for a total of 168 hours per week.

AMENDED CONSENT DECREE

[3284355.3]

### 5.     Dentist

The Jail shall employ a dentist.  That person shall be available on-site at the Jail one day per week for 8 hours.

### 6.     Psychiatrist

The Jail shall employ a psychiatrist or psychiatrists to provide mental health services at the Jail during the normal business hours of the Clinic.  The Jail shall employ the psychiatrist(s) as set forth in **Exhibit C** for a total of 8 hours per week.  The Jail will also utilize a telepsychiatry program.  As set forth in **Exhibit C**, those services will be available two(2) days per week, eight (8)hours per day.

### 7.     Licensed Clinical Social Worker (LCSW) and/or Marriage and Family Therapist (MFT)

The Jail shall employ Licensed Clinical Social Workers and/or Marriage and Family Therapists.  The Jail shall employ LCSWs and MFTs as set forth in **Exhibit C** for a total of 80 hours per week.  Individuals in these positions must be able to provide mental health screenings for those identified as possibly needing mental health services, conduct psychosocial assessments to include a mental status examination and diagnosis, conduct suicide risk assessments, develop treatment plans, provide psychosocial therapy as clinically indicated with the intent of coordinating care beyond the walls of the Jail and into the community upon release, refer inmates for psychiatric evaluation to determine if psychotropic medication is needed, conduct mental health evaluations to determine whether an inmate should be placed in a safety cell or transferred to a psychiatric hospital, and coordinate care with custody and medical staff as necessary.

### 8.     Private Health Care

Each inmate must also be advised that he or she may retain any physician, dentist, or mental health personnel at his or her own expense.  The inmate shall reimburse the County for actual additional costs in the event the inmate must be transported to medical treatment out of the Yuba-Sutter Bi-County area.  These private health care personnel may,

[3284355.3]

in coordination with Jail staff, enter the Jail to provide services.

### 9.   Medical Decision-making

When health care personnel are present in the Jail, medical decisions shall be made by them.  In the event no health care personnel are present, the Correctional Officers are responsible for contacting the appropriate health care person or facility as needed and for providing health care treatment as previously instructed by the health care personnel.

### 10.   Specialists and Consultants

Specialists and consultants from the private sector shall be employed as needed. Inmates may also employ, at their own expense, private physicians, dentists, and mental health personnel.

### B.   Custody Staff

The Jail must be staffed as required by Title 15 CCR Minimum Jail Standards and as necessary to comply with this Amended Consent Decree.

In order to insure that there is a sufficient number of custody staff for the Jail, the Jail Supervisor shall prepare and maintain a staffing plan indicating the personnel assigned to the Jail and their duties.  That staffing plan shall be available to be reviewed by the Board of State and Community Corrections as part of its biennial inspection.

If the Board of State and Community Corrections makes a finding that Jail staff levels are insufficient to comply with Title 15, the Sheriff shall so inform the Yuba County Board of Supervisors and shall request any additional funding which is necessary to address the finding of the Board of State and Community Corrections.  The Board of Supervisors shall make a good faith attempt to fund such recommended positions and shall utilize available state and federal funding for that purpose.

Correctional Officers must be fully informed by the Jail Supervisor about the terms of this Amended Consent Decree and must receive training in conformity with Article 3 of Title 15 California Code of Regulations, Minimum Standards for Local Detention Facilities.

[3284355.3]

Included in the Jail's mandatory positions shall be a Recreation Aid, or another person responsible for fulling those duties.  The Recreation Aid position shall be filled 40 hours per week, Monday – Friday.  The Recreation Aid shall be required to supervise and insure compliance with required exercise and recreation, develop and implement appropriate recreation programs, supervise the maintenance of recreation equipment, provide recreation equipment for inmates who request it, and monitor and update the Jail library.  The Recreation Aid may have responsibilities other than those noted above, provided they do not interfere with his or her ability to accomplish the duties outlined above.

For every shift, there are designated Floor Officers.  The duties of the Floor Officer include coordination with the Recreation Aid to carry out responsibilities which include answering the questions of inmates, coordinating retrieval of requested law and recreation books, responding to inmate complaints, and supervising and insuring compliance with required exercise, recreation, shower, and library periods.

## V.   MEDICAL AND MENTAL HEALTH CARE

Although an inmate is entitled to all of the health and medical services contained herein, he or she may refuse to accept any or all of the offered services unless the care is necessary to treat a communicable disease or condition.

### A.   Medical and Mental Health Procedures for New Arrestees

Defendants shall assess its Intake and Booking Screening Plan to ensure that it specifies standards and timelines to ensure that arriving inmates are promptly screened for urgent and emergent medical and mental health needs and disability accommodations by a physician's assistant, nurse practitioner, or registered nurse in an area that provides for confidentiality.  Translators and interpreters will be used whenever necessary to ensure effective communication.

The Jail shall use the Intake Screening Form attached as **Exhibit D**.  If Defendants want to modify that form, they shall first meet and confer with Class Counsel to discuss

1   the proposed changes.

2        As part of the intake process, the PA/NP/RN shall assess whether an arriving inmate

3   must be excluded from the Jail and sent for medical evaluation and treatment to Rideout

4   Memorial Hospital or a comparable facility, or for mental health evaluation and treatment

5   to Rideout Hospital, Sutter-Yuba Behavioral Health Services or to comparable facilities.

6        The PA/NP/RN must also assess whether an arriving inmate is intoxicated and/or

7   suffering from withdrawal or at high risk for withdrawal from alcohol or other drugs.  If

8   the inmate displays signs of acute alcohol or drug withdrawal, the arresting officer must

9   transport the arrestee to Rideout Memorial Hospital, Sutter-Yuba Behavioral Services, or

10  to a comparable facility.  Only after the examining physician certifies that the new arrestee

11  is fit for incarceration may the arrestee be incarcerated.  Inmates who display signs of non-

12  acute alcohol or drug intoxication or withdrawal will be accepted to the Jail and will be

13  treated in accordance with the third-party medical provider's protocols for substance

14  withdrawal, which were provided to Plaintiffs' counsel on May 3, 2018.

15       If an arrestee is taken to an emergency treatment center or mental health facility for

16  a medical or mental health evaluation and clearance prior to booking, documented

17  evidence of such evaluation, treatment and clearance must be returned to the Jail so as to

18  become part of that inmate's medical record.  That inmate shall be seen at the next sick call

19  to determine the future course of treatment, if any.

20       The medical/mental health condition of a new arrestee found fit for incarceration by

21  an examining health care professional, but requiring medical attention or care, shall be

22  considered when making housing decisions.

23       Any new arrestee with a communicable disease or condition, as determined by

24  medical staff, must be located in appropriate housing to prevent the spread of disease.

25  This individual must be seen by the PA, NP, or RN at the next sick call.  Any new arrestee

26  with a chronic condition must also be seen by the PA, NP, or RN at the next sick call.  Any

27  woman arrestee who indicates that she is or may be pregnant must be seen by the PA, NP,

28

[3284355.3]

or RN at the next sick call.  Any person who states that he or she requires a special diet must be seen by the PA, NP, or RN at the next sick call.

Any new arrestee who states that he or she has a mental illness, is taking psychiatric medications, or who the medical booking staff identifies as having a mental illness must be seen by a Qualified Mental Health Professional within twenty-four (24) hours.

Any new arrestee accepted into the Jail who the booking medical staff identifies as having any current suicidality shall have a suicide risk assessment completed as soon as possible but no later than within four (4) hours of the identification of current suicidality. Only Qualified Mental Health Professionals, PAs, NPs, or RNs who have been trained regarding how to conduct a suicide risk assessment shall conduct such assessments.  A suicide risk assessment shall be conducted by a Qualified Mental Health Professional if one is on-site at the Jail.  A suicide risk assessment may be conducted by a PA, NP, or RN if no Qualified Mental Health Professional is on-site at the Jail or there is no Qualified Mental Health Professional available to timely complete the assessment due to servicing the urgent needs of other inmates.  If the PA, NP or RN conducts the risk assessment, within two (2) hours after administering a suicide risk assessment, the staff member who conducted the assessment must consult with a Qualified Mental Health Professional (either on-site or by phone) to determine an appropriate plan of treatment and the appropriate level, if any, of suicide precaution.  If the person is placed on suicide watch, safety cell protocol will be followed.  If the suicide risk assessment establishes that the inmate is at risk of suicide, the inmate will, at a minimum, be placed on the next psychiatrist sick call.  The Qualified Mental Health Professional who conducts the suicide risk assessment or with whom the PA, NP, or RN who conducted the assessment consults, can, if necessary, consult with an on-site (if available) or on-call psychiatrist at any time, refer the inmate to be seen by a psychiatrist before the next psychiatrist sick call, or cause the inmate to be transferred to a hospital for evaluation.

As part of the intake screening, medical staff must also assess whether an inmate

AMENDED CONSENT DECREE

[3284355.3]

1   requires an assistive device due to a physical or mental disability.  Upon intake, the

2   PA/NP/RN, in consultation with the Jail Supervisor, may issue such equipment as needed

3   to accommodate an inmate's needs such as wheelchairs, canes, etc.  Defendants shall

4   eliminate Yuba County Jail Manual, Order #D-203(II)(B) and (C).  However, nothing in

5   this Amended Consent Decree shall preclude Defendants, after conducting an

6   individualized determination, from imposing reasonable restrictions regarding the

7   possession of assistive devices as may be required to maintain the safety and security in

8   the Jail.  Any prohibition of assistive devices shall be made in consultation with the Jail

9   medical staff and a least restrictive method of accommodating the inmate shall be made by

10  the Jail.  Any prohibition of assistive devices shall be memorialized by Jail staff in a Jail

11  Incident Report, with copies of such determinations sent to Class Counsel on a quarterly

12  basis.

13      All intake screenings shall be performed by a PA/NP/RN.  However, there may be

14  circumstances where the screening must be performed by an LVN because a PA/NP/RN is

15  not available to timely conduct the screening.  If an arrestee is screened by an LVN rather

16  than a PA/NP/RN, the LVN must consult a Physician, NP, PA or RN within four (4) hours

17  to review the intake information and determine whether the inmate shall be accepted into

18  the Jail.  If consultation with a physician, NP, PA, RN is not possible within four (4) hours,

19  the prisoner shall be seen by a physician, PA, NP, or RN at the next sick call.

20      Measured on a quarterly basis, LVNs shall not conduct more than 5% of all intake

21  screenings.

22      **B.      Access to Medical and Mental Health Care**

23      To address the provision of care for inmates with medical and/or mental health

24  needs and to ensure they receive timely treatment appropriate to the acuity of their

25  conditions, Defendants are to provide the following:

26      **1.      Initial Health Assessment**

27      Every inmate must be provided with a routine reception health assessment by a

28

[3284355.3]

physician, PA, NP, or RN within fourteen (14) days after booking, unless an inmate presents with urgent medical needs, in which case the health assessment must be conducted sooner.

Situations that may require an earlier health assessment include: (1) when an inmate requires a medical clearance prior to being accepted into the Jail, (2) when an inmate has or is suspected to have a communicable disease, (3) when an inmate has a chronic condition that requires active management; (4) when an inmate regularly ingests prescription medication, (5) when an inmate is pregnant or is possibly pregnant, (6) when an inmate needs a special medical diet, and (7) any other circumstance in which a Qualified Medical or Mental Health Professional determines that an earlier health assessment is warranted. A sick call visit shall be considered a health assessment for purposes of this section.

A medical file must be opened for each inmate at the time of assessment. Inmates must be advised at the commencement of the health assessment that they have a right to such an assessment but that they also have a right to refuse all or any portion of the assessment. The health assessment must also include an oral explanation of the health services available. Provision shall be made to communicate this information to non-English speaking inmates and to inmates with disabilities. The inmate shall also be informed that detailed health education information is available in pamphlet form.

All routine reception health assessments must include the following procedures, tests, and evaluations:

### (a)   Receiving Screening Form

This form shall be reviewed and attached to the medical records.

### (b)   Medical History Interview

This interview shall include inquiries of the inmate such as regularly taken prescription medications, current dietary needs, chronic health problems, use of non-prescribed drugs, unusual bleeding or discharges, allergy to medications and other

1  substances, ulcers, itchiness, lacerations, abscesses, high blood pressure, previous

2  fractures, previous significant illnesses, previous significant injuries and operations,

3  relevant family history (e.g., heart disease, cancer, substance abuse, suicide, etc. ), risk

4  factors for sexually transmitted disease, history of sexual abuse and/or abusiveness, history

5  of mental illness and suicidality, and disabilities and related accommodations.  In addition,

6  for women, inquiries must be made about their menstrual cycle and any unusual bleeding,

7  current use of contraceptive medications, presence of an I.U.D., breast masses, nipple

8  discharges, and pregnancy.

9              **(c)    Physical Examination**

10     This examination shall include measurements of height, weight, blood pressure,

11  pulse, temperature, and respiration.  The inmate shall be also inspected to determine if

12  there are signs of trauma, recent surgery, abscesses, open wounds, drug use, jaundice,

13  disabilities, and communicable diseases.

14              **(d)    Screening**

15     Inmates shall be screened for the following: head (contusions, lacerations, and dried

16  blood), ears (gross hearing loss, blood or other discharge), nose (discharge and recent

17  injury), eyes (bruises, jaundice, gross movements, and pupil reactivity), chest (labored or

18  unusual breathing and wounds), abdomen (tenderness, signs of blunt injury, and surgical

19  scars), genitalia (discharge, lesions, and lice), extremities (signs of drug use, deformity,

20  abscesses, and "tracks").

21              **(e)    Tests**

22     A tuberculosis skin test shall be conducted on all incoming inmates.  Other tests,

23  such as urine tests, cultures and blood tests for detection of sexually-transmitted diseases,

24  shall be performed as medically indicated.

25              **(f)    Dental Assessment**

26     Each inmate shall be inspected and questioned as to untreated cavities, broken teeth,

27  dentures, color and condition of tissues, tumors or lesions of the soft and hard tissues, and

28

[3284355.3]

1    state of oral hygiene.

2              **(g)    Follow-Up Care**

3         Positive findings and conditions requiring further evaluation and/or treatment shall

4    be referred to the appropriate provider, i.e., medical, mental health and dental, at the next

5    scheduled sick call.  Urgent conditions will be referred immediately to on-site or on-call

6    provider resources.

7              **(h)    Twelve-month Health Care Evaluation**

8         Inmates who remain in the custody of the Jail for twelve (12) months will receive a

9    comprehensive health care evaluation.  For female prisoners, the evaluation will include a

10   pelvic and breast exam and a Pap smear.  Following the initial evaluation, the inmate shall

11   receive a yearly physical evaluation.

12             **(i)    Use of PHQ-9 Form**

13        In order to assess mental health issues, as part of the 14-day assessment, a Qualified

14   Medical Professional will meet and complete the PHQ-9 form for each inmate.  Depending

15   on the results, the inmate will be referred for further mental health evaluation and

16   treatment.

17        **2.    Continuity of Care**

18        Defendants shall maintain a system of care to provide services that resemble what is

19   provided in the community, including developing treatment plans and providing therapy in

20   confidential settings as clinically indicated, with appropriate language interpretation

21   services, with the intent of coordinating care beyond the walls of the Jail and into the

22   community upon release.

23        **3.    Treatment for Infectious Diseases and Chronic Conditions**

24        Defendants shall maintain up-to-date policies and procedures for identification,

25   treatment, isolation, surveillance, immunization (when applicable), prevention, education,

26   and follow-up related to infectious diseases.  If an inmate is found to have an infectious

27   disease, he or she shall be immediately treated.

28

[3284355.3]

Defendants shall maintain systems for managing patients with chronic health conditions through screening, identifying, monitoring, and providing treatment to these patients while detained at the Jail.  Inmates with chronic conditions shall be monitored pursuant to chronic care protocols and standardized procedures that are consistent with national practice guidelines.  If an inmate has a chronic condition such as diabetes, hypertension, high blood pressure, arthritis, or other painful or dangerous affliction, it shall be treated immediately.  Any patient whose chronic condition cannot be managed at the Jail will be transferred offsite for appropriate treatment and care.

**4.      Continuity of Community-Prescribed Medications**

Continuation and bridging of all medications begun prior to incarceration is essential to the health and well-being of inmates.  The Jail shall make its best effort to ensure that inmates will not miss any medications.

All inmates who, at the time of booking, are prescribed medications in the community, and it is verified those medications are currently being taken, shall be timely continued on those medications, or prescribed comparable appropriate medication, unless a physician, NP, PA, or psychiatrist makes a clinical determination, via a face-to-face assessment (which includes use of tele psychiatrist under appropriate standards and policies), that the medications are not necessary for treatment, and documents the clinical justification for discontinuing a community-prescribed medication.  Defendants shall not discontinue community-prescribed psychiatric medications based solely on an inmate's history of substance abuse.

Any inmate who, at the time of booking, reports to Defendants that he or she is taking medications in the community but his or her medications cannot be verified, shall be timely assessed by a physician, PA, NP, or psychiatrist and timely prescribed medications necessary to treat his or her medical or mental health needs, to ensure continuity of care.  If there is a question regarding the propriety of a medication, a physician, PA, NP, or psychiatrist must be contacted before the prescription medication is

[3284355.3]

1  denied.

2        At the time of booking, if an arrestee reports that he or she needs certain

3  medications, that person shall be seen at the next sick call, unless it is determined that the

4  person cannot wait until then.  In such cases, the arrestee shall be sent to Rideout Hospital.

5        Any new arrestee who regularly takes medication must be seen by the nurse at the

6  next sick call.

7        Inmates who are prescribed psychiatric medication by a physician, PA, NP, or

8  psychiatrist, or who are continued on community-prescribed psychiatric medication, will

9  be re-evaluated by a psychiatrist every 30 days until the condition is stable, then every 30

10 to 90 days at the clinical discretion of the psychiatrist.  More frequent evaluations will be

11 scheduled as determined by the inmate's health care provider.

12      **5.     Medical Assistance for Intoxicated Inmates and/or Inmates in
            Withdrawal**

13

14      If there is reasonable cause to believe that a person is addicted to a controlled

15 substance or alcohol or is potentially undergoing withdrawal, the inmate must either be

16 timely assessed and treated by a Qualified Medical Professional at the Jail or transported

17 immediately to an appropriate hospital facility, such as Rideout Memorial Hospital.

18      Detoxification from alcohol, opiates, hypnotics, other stimulants, and sedative

19 hypnotic drugs, when performed in this facility, will be done under medical supervision in

20 accordance with the third-party medical provider's policies and protocols.

21      Custody staff shall conduct health and safety checks for those inmates placed in a

22 sobering cells.  Health and safety checks shall occur every 30 minutes at irregular and

23 unpredictable intervals or more frequently if medical or mental health staff believe more

24 frequent checks are necessary to protect the health and safety of an inmate.

25      A Qualified Medical Professional shall evaluate inmates in sobering cells upon

26 admission and then every 6 hours thereafter or sooner if requested by custody staff.

27 Defendants shall keep complete, accurate, and contemporaneous logs of each health and

28

[3284355.3]

safety check and shall review such logs for compliance.  Sufficient custody staffing must also be maintained to allow medical staff to enter the sobering cells to make vital checks.

Inmates experiencing severe, life threatening intoxication (an overdose) or withdrawal which cannot be addressed in the Jail by available medical staff, shall be transferred under appropriate security conditions to a hospital or other facility where specialized care is available.

### 6.    Mental Health Services

The Jail will ensure that inmates are provided timely access to inpatient and outpatient mental health care as needed.  Mental health services at the Jail shall include, at a minimum, mental health screenings and evaluations, suicide risk assessments, diagnosis, and treatment—including psychosocial therapy, and psychotropic medication as needed, and referral services.  While inmates are entitled to assessment and treatment, they must be informed that they are also entitled to refuse such treatment.  Inmates requiring services beyond the on-site capability of the Jail shall be referred to appropriate off-site providers.

Any inmate who, either during the booking process or at any time during their incarceration in the Jail, is identified as having any current suicidality shall have a suicide risk assessment completed within (4) hours of the identification of current suicidality.  Only Qualified Mental Health Professionals, PAs, NPs, or RNs who have been trained regarding how to conduct a suicide risk assessment shall conduct such assessments.  A suicide risk assessment shall be conducted by a Qualified Mental Health Professional if one is on-site at the Jail.  A suicide risk assessment may be conducted by a PA, NP, or RN if no Qualified Mental Health Professional is on-site at the Jail or there is no Qualified Mental Health Professional available to timely complete the assessment due to servicing the urgent needs of other inmates.  If the PA, NP or RN conducts the risk assessment, within two (2) hours after administering a suicide risk assessment, the staff member who conducted the assessment must consult with a Qualified Mental Health Professional (either on-site or by phone) to determine an appropriate plan of treatment and the appropriate

level, if any, of suicide precaution.  If the person is placed on suicide watch, safety cell

protocol will be followed.  If the suicide risk assessment establishes that the inmate is at

risk of suicide, the inmate will, at a minimum, be placed on the next psychiatrist sick

call.  The Qualified Mental Health Professional who conducts the suicide risk assessment

or with whom the PA, NP, or RN who conducted the assessment consults, can, if

necessary, consult with an on-site (if available) or on-call psychiatrist at any time, refer the

inmate to be seen by a psychiatrist before the next psychiatrist sick call, or cause the

inmate to be transferred to a hospital for evaluation.

Mental Health services provided on-site will include crisis evaluation, medication

management, psychiatric evaluations and therapy.

Any inmate who was receiving outpatient care from the Sutter-Yuba Behavioral

Health Services, or other similar provider of behavioral healthcare services, at the time of

incarceration will be evaluated by a Qualified Mental Health Professional within 24 hours

of acceptance in the Jail.

Qualified Mental Health Professionals shall evaluate whether an inmate's mental

illness or risk of suicide requires that he or she be sent to Sutter-Yuba Behavioral Health

Services or an inpatient setting for evaluation and treatment, up to and including

psychiatric hospitalization where warranted, and shall issue all suicide precaution orders,

including placement in or removal from housing for inmates at risk of suicide, and

confidential follow-up assessments at clinically appropriate intervals.

On a weekly basis a Qualified Mental Health Professional shall consult with

Correctional Officers and Qualified Medical Professionals to exchange information with

respect to the mental health of the inmates.  The Qualified Mental Health Professional

must respect the confidential nature of communications to him or her, but has an obligation

to take steps to assure the safety of an inmate who indicates that he or she may attempt to

commit suicide or to harm another.

Inmates released to the community will be provided with written instructions for the

[3284355.3]

continuity of essential care, including, but not limited to, name and contact information for community providers for follow-up appointments, prescriptions, and/or adequate supply of medication for psychiatric patients.

### (a)    Telepsychiatry

Defendants may, under certain circumstances, utilize telepsychiatry as part of the mental health care services they provide, recognizing that telepsychiatry services may not be appropriate for inmates who have cognitive disorders or disabilities that affect communication and/or who speak languages other than the languages spoken by the telepsychiatry provider.

Within 120 days of signing this Amended Consent Decree, Defendants in conjunction with their contracted medical provider must develop and implement a policy regarding the use of telepsychiatry to treat inmates in the Jail.  The telepsychiatry policy must, at a minimum, be consistent with the policy approved in the Second Stipulation and Order Regarding Telepsychiatry Issues, *Hernandez et al. v. County of Monterey et al.*, No. CV-13-2354, Dkt. Nos. 631 & 632 (entered March 22, 2018) and provide that:

1.    Inmates shall, whenever possible, be seen in person by a psychiatrist, rather than by a telepsychiatrist;

2.    Telepsychiatry appointments are only conducted when a Qualified Mental Health Professional or RN is present and in person for the duration of the appointment;

3.    If a telepsychiatry appointment results in an emergency diagnosis, the inmate will be seen emergently by an in person psychiatrist or transferred to a hospital;

4.    Defendants must obtain and document a patient's written informed consent prior to providing treatment by telepsychiatry.  Informed consent for use of telepsychiatry with a patient shall include, at minimum: discussion of the structure and timing of services; procedures for coordination of care with other professionals; scheduling, including a protocol for contact between sessions; record keeping, including the process by which patient information will be documented and stored; privacy and confidentiality; potential

AMENDED CONSENT DECREE

[3284355.3]

1   risks; an agreed upon emergency plan; and information specific to the nature of

2   videoconferencing, inducing the potential for technical failure.  Defendants must develop

3   an informed consent form to be reviewed with and completed by the patient prior to the

4   provision of telepsychiatry;

5        5.      Defendants must develop a procedure for providing all relevant clinical data

6   of the patient to the telepsychiatrist at least one (1) hour in advance of the telepsychiatry

7   session.  This information may be provided either by (a) providing the patient's entire

8   medical and mental health file to the telepsychiatrist; or (b) providing pertinent records

9   documenting the patient's active psychiatric and medical conditions (including treatments

10  and responses), past medical and psychiatric treatments (including treatments and

11  responses), pertinent lab results and progress notes, and an abbreviated social history to the

12  telepsychiatrist.  Information provided by way of the second option shall be captured and

13  documented in a chart review form.  Additional clinical data may be sent to the

14  telepsychiatrist during or after the telepsychiatry session as necessary;

15       6.      Telepsychiatry treatments must be documented and the documentation must

16  be placed in the inmate's medical file within twenty-four (24) hours and must specifically

17  include the date and duration of the encounter, that the encounter was conducted via

18  telepsychiatry, the psychiatrist's assessment, patient history, treatment plan, and informed

19  consent;

20       7.      Telepsychiatry sessions shall be conducted so that clinical discussion cannot

21  be overheard by other patients.  Custody staff may maintain visual supervision but may not

22  be close enough to overhear communication, absent security concerns based on an

23  individualized determination of risk which includes consideration of a request by a

24  qualified mental health practitioner requiring that custody staff be closer at hand for that

25  specific inmate;

26       8.      Defendants' telepsychiatry facilities and technological capabilities must be

27  regularly vetted to ensure: the normal operation of the devices do not have technological

28

[3284355.3]

1  difficulties; up-to-date antivirus software and a firewall is installed; reliable management

2  software is used to provide consistent oversight of applications; adequate security by using

3  point-to-point encryption; and the maintenance of the most reliable connection method to

4  access the Internet.  Technical problems that interrupt or prevent adequate patient

5  assessment shall be documented in a log as well as the patient record; and

6        9.     Defendants' telepsychiatry policy shall ensure that telepsychiatric care is

7  subject to Quality Assurance monitoring that addresses the particular requirements for

8  telemedicine, including but not limited to whether records are being reviewed as

9  appropriate, whether the technology is working, and whether patients are consenting to

10  telemedicine sessions and getting timely access to on-site care when they do not consent.

11      **7.    Women's Health**

12        In addition to the procedures outlined throughout this section, the following health

13  care procedures must be followed for women inmates.  Any woman taking birth control

14  must be permitted to continue taking it on a regular basis as prescribed.  An I.U.D. in place

15  may not be removed without the woman's consent.  Sanitary napkins and tampons must be

16  available for every female inmate.

17        If a woman believes she is or may be pregnant, she is entitled to a pregnancy test.  If

18  she is pregnant, she is entitled to regular pre-natal and post-natal care, a special diet,

19  supplementary vitamins, and other care as prescribed by a physician.  A female inmate has

20  the right to summon and receive services in connection with a pregnancy from a private

21  physician at her own expense.  An indigent woman is entitled to receive medical service in

22  connection with a pregnancy on the same basis as an indigent woman would be entitled to

23  receive such services under the Medi-Cal program.  Provision shall be made to effectively

24  communicate all of this information to non-English speaking inmates and to inmates with

25  disabilities.  The special needs of lactating mothers must be accommodated.

26        Nondirective counseling in connection with a pregnancy and pregnancy prevention,

27  including access to emergency contraception, shall be offered upon request.  All of the

28

1   rights contained in this subsection must be posted in the women's portion of the Jail.

2   **8.   Dental Services**

3   A Dentist will be available one day per week for eight (8) hours.

4   Inmates shall receive emergency dental treatment, which includes those procedures

5   directed toward the immediate relief of pain, trauma and acute oral infection that

6   endangers the health of the detainee.  It also includes repair of prosthetic appliances to

7   prevent detainee suffering.  Those who need emergency dental procedures or procedures

8   that cannot be performed by the onsite dentist because the necessary care is beyond the

9   scope of care capable of being provided at the Jail or because the dentist is not on site will

10  be referred to an outside provider.

11  Unless otherwise required earlier, Inmates who have been in the Jail for twelve (12)

12  months or more may receive routine dental treatment.  Routine dental treatment includes

13  amalgam and composite restorations, prophylaxis, root canals, extractions, x-rays, the

14  repair and adjustment of prosthetic appliances and other procedures required to maintain

15  the detainee's health.  If, in unusual circumstances, an Immigrations and Customs

16  Enforcement ("ICE") detainee does not receive dental services because ICE refuses to

17  approve or authorize the dental treatment and Defendants are prohibited by state statute

18  from expending the County's own funds for the treatment, Defendants will not be deemed

19  to be non-compliant with this provision.

20  **9.   Sick Call**

21  Daily sick call must be provided to all inmates requesting medical attention by an

22  RN/PA/NP.  All inmates desiring to see a PA, NP, or RN must be permitted to fill out a

23  sick call request form.  Sick call request forms shall be readily available to inmates, and

24  Correctional Officers shall provide these forms to inmates and transmit these requests to

25  the PA, NP, or RN.

26  The PA, NP, or RN will triage forms within 24 hours.  Inmates with emergent

27  issues shall be seen immediately.  If an inmate needed medical attention when booked, has

28

[3284355.3]

a communicable disease or chronic condition that requires active management, regularly takes prescription drugs, needs a special medical diet, or if a female indicates she is or may be pregnant, the PA, NP, or RN shall also prioritize seeing the individual at that sick call. Urgent sick call requests shall be seen by the on-duty medical provider within 24 hours. Routine requests shall be scheduled within 72 hours, unless in the opinion of the PA, NP, or RN that is not medically necessary.  All medical sick call encounters requiring a physical exam shall occur in a room with an examination table, sink, proper lighting, proper equipment, and with a medical record.  Any inmate who the PA, NP, or RN wishes to see for any purpose must be brought to the examining room during sick call unless the inmate refuses.

If during sick call the PA, NP, or RN determines that the inmate should see a physician, PA, NP, a dentist, or a Qualified Mental Health Professional, or other specialist, the PA, NP, or RN shall make an appropriate referral.  This referral shall indicate the maximum time which can elapse before the inmate is either transported to the proper person or facility or the proper person attends the inmate at the Jail.  In general, a follow-up evaluation shall take place immediately for emergent concerns, within 24 hours for urgent concerns, and within 14 days for non-emergent or non-urgent concerns. Correctional Officers shall insure that the inmate is transported to the proper person or facility within the specified time interval.

If a healthcare professional believes that tests, evaluation, or treatment by a specialist is medically indicated, the physician shall fill out a referral slip indicating the maximum time which can elapse before the test, evaluation, or treatment.  Correctional Officers have the obligation to insure the referral is completed within the indicated time interval.

So as to facilitate medical care in the Jail, the examining room must have a toilet nearby and must be equipped with the following: examining table, sink for handwashing, light, blood pressure cuff, thermometer, stethoscope, ophthalmoscope, otoscope, reflex

[3284355.3]

1  hammer, wheel chair, specula, culture plates, syringe, needles, scale, tongue depressors,

2  dressing and other necessary equipment.  Some of the above may be brought in daily by

3  the PA, NP, or RN or LVN as convenience dictates.

4  Defendants shall develop and implement a process to track and assess the

5  timeliness of providing sick call services.  Defendants shall review and assess that

6  information on a quarterly basis, at a minimum.  As part of the quarterly production of

7  documents to Class Counsel, *see* Section XV, *supra*, Defendants shall produce the results

8  of the review and assessment of the sick call process.  The medical and mental health staff

9  shall, on a monthly basis, meet to discuss the provision of health care services in the Jail,

10  including addressing the timeliness of sick calls and prescription renewals, identification of

11  causes of systematic delays or other impediments to providing timely access to medical

12  and mental health care, and develop protocols and practices to address such issues.  If the

13  cause of any ongoing delays or issues that last for three months or more is related to

14  insufficient medical or mental health staffing, the Jail shall take all reasonable steps to

15  revise their medical and mental health staffing plan and obtain funding to retain any

16  additional positions deemed to be necessary.

17  **10.  Emergency Care and Hospitalization**

18  Emergency dental, medical, and psychiatric care must be available twenty-four (24)

19  hours per day, seven (7) days a week.  In an emergency dental, medical and/or mental

20  health situation, or at the request of health care personnel, an inmate must be transported to

21  the appropriate hospital for treatment and evaluation.  Security requirements and concerns

22  cannot unreasonably delay the inmate's transportation.

23  Inmates shall have access to emergency call buttons and telephones to alert

24  Correctional Officers of emergency situations.  Correctional Officers shall also be alert to

25  emergency situations as part of the regular patrols of the Jail, which occur hourly.  The

26  times of such regular patrols are to be noted in the Jail log.

27  For individuals who are in acute psychiatric distress and in need of urgent inpatient

28

[3284355.3]                          AMENDED CONSENT DECREE

psychiatric care that cannot be provided at the Jail, whether or not awaiting transfer to a state hospital pursuant to court order, the Jail shall comply with the following plan:

1. The inmate will be taken to Rideout Hospital, where Sutter Yuba Behavioral Health (SYBH) has staff on site.

2. SYBH staff will evaluate the inmate and make a determination in writing whether the person requires care that cannot be provided at the Jail.

    a. If SYBH staff make a determination in writing that the person does not require psychiatric care that cannot be provided at the Jail, that person will be returned to the Jail with instructions for further evaluation and care, if any.

    b. If SYBH staff determine that the person does require psychiatric care that cannot be provided at the Jail, SYBH will care for that individual (either at Rideout or its psychiatric care facility) or locate bed space at another facility.

3. The Jail will work cooperatively with Sutter Yuba Behavioral Health to locate bed space.

No inmate shall be denied or unreasonably delayed emergency hospitalization which is medically indicated for security reasons.

The Jail shall provide inmates with adequate care when they are awaiting transfer to and have returned from such facilities.  All inmates returning from emergency medical or psychiatric treatment at an outside facility will be (a) screened at intake for continuity of care (which will include, if necessary, consultation with a physician or psychiatrist for continuity of prescribed medications) and to ensure that the Jail has all relevant medical records, labs, and orders from the inmate's treatment at an outside facility; (b) seen at the next sick call by a mid-level provider (PA, NP, or RN for inmates returning from medical treatment or Qualified Mental Health Professional for inmates returning from mental health treatment); and (c) seen at the next available sick call conducted by a higher-level provider (physician for inmates returning from medical treatment or psychiatrist for inmates returning from mental health treatment).

[3284355.3]

The Jail must implement a system of tracking individuals who have been found incompetent to stand trial.

Correctional Officers must be familiar with Jail policies and also must be able to provide first-aid care and cardiopulmonary resuscitation.  Correctional Officers shall carry emergency response equipment on themselves at all times, shall make emergency response equipment sufficiently accessible, and shall respond to potential and actual emergencies with urgency.

If an inmate requests emergency medical attention and a Correctional Officer does not believe such attention is necessary, the Correctional Officer must contact the physician, PA, NP, RN, or psychiatrist who is at the Jail or on-call to receive an expert opinion on treatment, or must transport the inmate to an appropriate medical facility.

**11.    Recordkeeping**

Correctional Officers and Qualified Medical and Mental Health Professionals must maintain complete, current, and accurate records regarding an inmate's health care treatment and prescription drug use.  An individual record (hereinafter referred to as the "Jail medical record") must be kept for each inmate, and a copy of this record must be kept in a separate file in the Jail or in an electronic database.  These records must be standardized so as to facilitate communication among staff.  Provision in the records must be made to allow entry of the following information:  history, complaints, treatment plan, and progress notes.  All entries must be dated and the time noted.  In addition, Correctional Officers and Qualified Medical and Mental Health Professionals must record the fact that a drug or other prescribed treatment was administered, at what time, in what dosage, and by whom on the form available for that purpose.

All clinical contacts, diagnoses, and treatments by Qualified Medical and Mental Health Professionals must be entered in the Jail medical record.

Upon release from the Jail, an inmate's doctor must be provided, upon request, with a copy of all of the inmate's Jail medical records.  The Jail medical records are confidential

[3284355.3]

and, except for the drug dosage record, the custodial staff shall not review the records. When necessary or upon request of the attending physician, Correctional Officers shall transmit an inmate's medical record to the attending health care personnel.

**12.   Distribution and Storage of Prescription Drugs**

Defendants shall follow their written procedures for the secure storage and controlled administration of all prescription drugs.  At a minimum these procedures must provide for: securely lockable cabinets and refrigeration units, means for a positive identification of the recipient of the prescribed medication, such as hospital arm bands or photographs, procedures for administering prescription drugs only in the dose prescribed and at the time prescribed, procedures for confirming that the recipient has ingested the medication, procedures for recording the fact that the prescribed dose has been administered and by whom, and procedures which prohibit the administration of drugs by inmates.  Non-prescription medication may be dispensed to inmates according to specific, written rules.

All Qualified Medical and Mental Health Professionals shall be trained to recognize the common side effects associated with use of psychotropic medications.  If a nurse observes that an inmate is experiencing any of these side effects, they will document their observations in the medical record and schedule the patient to see a medical provider at the next available sick call.

If a prescribed substance is refused or withheld, a notation will be made in the inmate's medical record and the prescribing medical provider shall be notified after three consecutive refusals.

Following the medication administration, the nursing staff shall also notify the physician promptly of the following:  (a) Any adverse reaction or response by a patient to a medication; and/or (b) Any error in the administration of a medication to a patient.

**13.   Medical and Mental Health Training for Correctional Officers**

Adequate training shall be provided to all custody officers who work with inmates

at the Jail.  A minimum of four (4) hours of physical and mental health training for each Correctional Officer must be provided each year by Sutter-Yuba Behavioral Health Services Department or a Qualified Medical Professional and a Qualified Mental Health Professional, or other qualified trainer in mental health, including suicide risk issues.

This training shall, at a minimum, include the following:  (1) administration of first aid; (2) recognizing the need for emergency care and intervention in life threatening situations (e.g., heart attack); (3) recognizing acute manifestations of certain chronic illnesses (e.g., asthma, seizures), intoxication and withdrawal, and adverse reactions to medications; (4) recognizing signs and symptoms of mental illness and appropriate responses thereto; (5) procedures for appropriate referrals of inmates with health complaints to health staff; (6) procedures for appropriate referral of inmates with health complaints to health staff; and (7) cardiopulmonary resuscitation.

### 14.    Inmate's Rights

Every inmate must be provided with complete information as to all medical procedures scheduled for him or her and possible dangers from such procedures.  The procedures, tests, and examinations may only take place with the inmate's informed consent.  Confidentiality must be maintained in recordkeeping and in communications among the health personnel so that no non-health personnel have knowledge of an inmate's medical condition or history unless necessary to ensure the safety of the prisoner, other prisoners, staff, or the institution, or necessary to accommodate an inmate's disability or disabilities.  Medical care and treatment shall not be provided within the presence of custody personnel, unless necessary for safety and security reasons.  The doctor-patient privilege exists between the inmate and any health care personnel.  Care cannot be conditioned on the waiver of any right guaranteed to the inmate by the Constitution, by statute, or by this Amended Consent Decree.  No inmate may be disciplined for seeking medical or mental health care.  The inmates must be accorded a right to privacy within the reasonable requirements of adequate security.

Within 180 days of signing the Amended Consent Decree, Defendants will prepare proposed revisions to the Jail Handbook to make the Handbook consistent with the terms of this Amended Consent Decree.  Defendants will provide a copy of their proposed revisions to Class Counsel.  The parties will then meet and confer regarding the contents of the Jail Handbook.  Any unresolved issues regarding the Jail Handbook can be brought before the District Court.

### 15.    Effective Communication for Inmates with Disabilities and Limited English Proficiency

The Jail shall ensure effective communication is achieved and documented when there is an exchange of health care information involving a patient with a hearing, vision, and/or speech impairment; developmental disability and/or learning disability, and/or Limited English Proficiency (LEP).  In such interactions, the patients' primary method of communication shall be used.  If necessary under the circumstances, the patients' secondary method of communication shall be used.

Accommodations may be facilitated by sign language interpretation, certified bilingual health care staff, other certified contracted language interpreters, assistive devices, or other methods of assistance and accommodation, including the use of Language Line or video remote interpreting.  Except in emergency situations, neither inmates nor custody staff shall be used for interpretation services during any medical or mental health service.  If effective communication is not achieved, that shall also be documented.

The Jail shall designate an LEP coordinator (usually the ADA Coordinator) to ensure interpretation and translation services are available, current, and operational.  The Jail shall also post signs in the intake and booking areas as well as the medical and mental health treatment areas in English, Spanish, and the languages spoken by other significant segments of the Jail's inmate population listing what language assistance is available during any medical or mental health treatment, diagnostic test, or evaluation.

AMENDED CONSENT DECREE

[3284355.3]

## C.     Suicide Prevention

Qualified Mental Health Professionals shall be available on-site seven days per week and on-call as necessary to evaluate whether a prisoner's risk of suicide requires that he or she be sent out of the Jail for evaluation and treatment, up to and including psychiatric hospitalization where warranted, and shall issue all suicide precaution orders, including placement in or removal from housing for prisoners at risk of suicide, and confidential follow-up assessments at clinically appropriate intervals.

Custody and health services staff shall be trained and alerted to the need to continuously monitor inmate behavior for suicide potential during incarceration.

Custody, medical, and mental health staff shall maintain open lines of communication to ensure that all parties are kept apprised of suicide potential; suicide precaution placement, retention, and release status; monitoring findings including general status reporting through time of event and end-of-shift reporting and on call contacts to insure appropriate continuity of care and follow-up.

All custody and health care staff shall receive suicide awareness, prevention, and emergency response training during new employee orientation, and at least annually.  All such training shall be provided by or in collaboration with a Qualified Mental Health Professional, or other person qualified to provide training in the area of suicide risk, having expertise in correctional suicide prevention and the use of a suicide risk assessment form. Regularly scheduled training for all custody and health care staff shall include, at a minimum, identification and management of suicidal behavior in a jail setting including high-risk periods of incarceration, suicidal risk profiles, and recognition of verbal and behavioral cues that indicate potential suicide.

The Jail shall undertake a mortality-morbidity review for every inmate who dies while in the custody of Defendants, regardless of whether the inmate dies in the Jail or in a hospital or other facility after being transferred from the Jail.

## D.     Inmates with Disabilities

The Jail prohibits discrimination against persons with disabilities and adheres to the

[3284355.3]

1   Americans with Disabilities Act ("ADA") and all other applicable federal and state laws,

2   regulations and guidelines.

3       **1.**     **ADA Coordinator**

4       The Jail shall appoint a staff member to serve as the ADA Coordinator, whose

5   responsibilities include, but are not limited to, coordinating compliance with ADA

6   requirements, including compliance review of vendors providing sign language services.

7   The ADA Coordinator should work with the Training Sergeant as appropriate to develop

8   and deliver annually training regarding issues specifically related, but not limited to:

9   (a) the requirements of the ADA and Section 504 of the Rehabilitation Act, 29 U.S.C.

10   § 794, and (b) the Jail's policies and procedures relating to compliance with the ADA and

11   Rehabilitation Act.

12       **2.**     **ADA Compliance Plan**

13       Defendants shall make, at a minimum, all changes recommended in the Blackseth

14   Report of February 20, 2017, for removal and/or remediation of physical barriers in the

15   Jail.  The changes shall be completed according to the deadlines set forth in **Exhibit E**.

16   All changes shall be completed and operational by no later than four (4) years from the

17   date of approval of this Amended Consent Decree.  Defendants shall provide Plaintiffs

18   with updates on a quarterly basis regarding the status of the changes, setting forth the dates

19   on which each change was started and completed.  Plaintiffs shall be entitled to have a

20   CASP-certified expert accompany Plaintiffs' counsel on one or more of the Jail monitoring

21   tours provided for in Section XV to inspect the changes completed by Defendants to

22   confirm that the changes have been completed in accordance with relevant state and

23   federal law.

24       Defendants shall have a system for identifying and tracking all inmates who have a

25   disability and the accommodations they require for those disabilities.  The system shall

26   also identify and track the reasonable accommodations necessary for qualified inmates

27   with disabilities to participate in programs, services and activities offered by Defendants at

28

[3284355.3]

the Jail.  The information in the tracking system regarding inmates with disabilities and the accommodations they require must be readily accessible to all staff (including staff for the third-party provider of health care services) and must be updated at least twice per week. Custody and medical staff shall check the tracking system before all due process proceedings—including, but not limited to, adjudicating grievances and disciplinary infractions—and medical and mental health encounters.  Custody staff shall also check the tracking system before assigning inmates to housing and making program assignments (e.g., work, education, etc.).

Until Defendants have completed all structural changes set forth in **Exhibit E**, Defendants shall provide other accommodations to ensure the inmates have access to all Jail programs, services, and activities.

### 3.     Reasonable Accommodations

As required by the law, inmates' requests for a particular type of accommodation shall be given primary consideration and shall be granted unless the request is unreasonable for specific articulated reasons allowable under Title II of the ADA or poses a significant safety or security threat.

If requested, Defendants shall offer reasonable accommodations to inmates with disabilities necessary to provide access to all programs, services and activities offered to other inmates, including, but not limited to, inmate work assignments, the Milestone program, and the Sheriff's Work Alternative program.  If there is a question regarding the ability of the Jail to provide an accommodation, Defendants shall conduct an interactive process to determine whether a reasonable accommodation can afford an inmate with a disability the ability to participate in a program, service, or activity.

All programs, services and activities shall be offered in accessible locations, including inmate work programs and the Milestone program.

If requested, reasonable accommodations shall include furnishing qualified sign language interpreters (in person or through Language Line services or video remote

[3284355.3]

interpreting) to any inmates for whom sign language is their only or primary method of communication, in all circumstances where a qualified sign language interpreter is necessary to ensure an inmate has an equal opportunity to participate in, and enjoy the benefits of, programs, services and activities offered by Defendants.

Defendants shall implement a system to document that Defendants have provided qualified sign language interpreters or reasonable alternatives to inmates who need them and that the inmates have understood the information conveyed by the qualified sign language interpreter or alternative form of communication as outlined above.

Defendants shall not remove health care appliances, such as canes, wheelchairs, eyeglasses, artificial eyes, dental prosthesis, artificial limbs, orthopedic braces and shoes, or hearing aids from an inmate in Administrative Segregation unless necessary to ensure the safety of persons, the security of the institution, or to assist in an investigation, and only when supported by documented evidence.  No inmate will be deprived of his or her appliance because of the acts of another inmate.

## VI.   ENVIRONMENTAL HEALTH AND SAFETY CONDITIONS

### A.   Suicide Hazards

Within 150 days of the District Court's approval of this Amended Consent Decree, Defendants shall conduct a safety assessment of the Jail, with a particular focus on the unrenovated portion of the Jail (the "Old Jail"), with the goal of identifying and attempting to eliminate tie-off points and other hazards that pose an unreasonable risk of being used by inmates to harm themselves or attempt suicide, and to identify any locations where the absence of security cameras creates an unreasonable risk to inmate safety.  To accomplish this goal, Defendants will retain a qualified consultant to develop and implement a plan to reduce suicide hazards believed to create an unreasonable risk of harm, and to improve safety and security, with particular focus on the Old Jail.  This consultant shall also suggest ways to improve accountability for razor blades, plastic cutlery, and toxic chemicals that can pose serious risk for inmates at risk of committing acts of self-harm or suicide.

1  Defendants' qualified consultant shall conduct follow up safety assessments of the Jail

2  every two years, at a minimum.

3      **B.      Housing For Inmates with Mental Illnesses or Who Are at Risk of
            Suicide**

4

5          An inmate's serious mental illness and suicide risk will be considered when

6  deciding where to house the inmate.  Housing decisions for inmates with serious mental

7  illness shall take into account the availability of sufficient structured and unstructured out-

8  of-cell time and increased observation and supervision commensurate with the inmate's

9  risk of suicide, as well as the risk posed by suicide hazards in various parts of the Jail.

10          Defendants shall maintain suicide watch and suicide precaution procedures to

11  ensure that inmates who pose a risk of suicide are not placed in punitive, unsanitary, and

12  dangerous conditions.  Where clinically warranted as decided by a medical or mental

13  health care professional, an acutely suicidal inmate shall be placed on suicide watch under

14  constant observation until such time as a Qualified Mental Health Professional determines

15  that the inmate is no longer at risk of self-harm.  Health and safety checks shall also be

16  conducted every 15 minutes in locations where inmates are housed who pose a high

17  suicide risk, and every 30 minutes in locations where inmates are housed who pose a

18  moderate suicide risk.  Whether a person poses a high, moderate, or low risk of suicide

19  shall be determined by a Qualified Mental Health Professional.  If it is determined a

20  suicidal inmate cannot be safely monitored and cared for within the Jail, Defendants shall

21  follow the plan, set forth in Section V.B.10, for transferring such patients to the hospital

22  for inpatient psychiatric care.  All steps taken to expeditiously transfer such inmates shall

23  be documented.

24          Defendants shall limit the use of Segregated Housing, including Administrative

25  Segregation and safety cells, for inmates with serious mental illness or who present a

26  serious suicide risk, and shall have procedures to mitigate the impact of Segregated

27  Housing on persons with mental illness.  Custody staff shall conduct health and safety

28

[3284355.3]

checks for inmates who are at risk of suicide in a manner that allows staff to personally view the inmate to assure his or her well-being and security.  Health and safety checks shall require visual observation and, if necessary to determine the inmate's well-being, verbal interaction with the inmate.  Custody staff shall conduct the checks at irregular and unpredictable intervals to minimize inmates' ability to plan around anticipated checks, and shall document their checks in a format that does not have pre-printed times.  Video surveillance may not be used as an alternative to rounds by custody staff.  Defendants shall keep complete, accurate, and contemporaneous logs of each health and safety check and develop measures to ensure review of such logs for compliance.

### C.    Safety Cells

Defendants shall maintain a Safety Cell Policy.  As set forth in that policy, an inmate shall only be placed in a safety cell if the inmate is identified as an imminent threat to himself/herself or others, and then only as a temporary measure until the inmate is able to be transferred to different housing or, where clinically warranted, to a hospital or inpatient facility.

Custody staff must visually observe each inmate who is placed in a safety cell at least twice every thirty (30) minutes.  The observations must be conducted at irregular and unpredictable intervals and must be documented.

An inmate must receive a medical assessment by a physician, PA, NP, or RN within one (1) hour (unless unsafe to do so under the circumstances) of placement into a safety cell, to determine whether said placement is appropriate.  The physician, PA, NP, or RN must evaluate whether the inmate can safely be housed in a less restrictive environment than a safety cell and/or requires transfer to an inpatient medical or mental health facility.

If the physician, PA, NP, or RN is unable to conduct a hands-on assessment of the inmate, including a check of vital signs, within six (6) hours of placement in the safety cell, the inmate shall immediately be transferred to a hospital.

A Qualified Mental Health Professional, Physician, PA, NP, or RN must conduct a

AMENDED CONSENT DECREE

[3284355.3]

suicide risk assessment on all prisoners placed in safety cells as soon as possible, but no later than within four (4) hours of safety cell placement.  Only Qualified Mental Health Professionals, PAs, NPs, or RNs who have been trained regarding how to conduct a suicide risk assessment shall conduct such assessments.  A suicide risk assessment shall be conducted by a Qualified Mental Health Professional if one is on-site at the Jail.  A suicide risk assessment may be conducted by a PA, NP, or RN if no Qualified Mental Health Professional is on-site at the Jail or there is no Qualified Mental Health Professional available to timely complete the assessment due to servicing the urgent needs of other inmates.  If the PA, NP or RN conducts the risk assessment, within two (2) hours after administering a suicide risk assessment, the staff member who conducted the assessment must consult with a Qualified Mental Health Professional (either on-site or by phone) to determine an appropriate plan of treatment and the appropriate level, if any, of suicide precaution.  If the person is placed on suicide watch, safety cell protocol will be followed.  If the suicide risk assessment establishes that the inmate is at risk of suicide, the inmate will, at a minimum, be placed on the next psychiatrist sick call.  The Qualified Mental Health Professional who conducts the suicide risk assessment or with whom the PA, NP, or RN who conducted the assessment consults, can, if necessary, consult with an on-site (if available) or on-call psychiatrist at any time, refer the inmate to be seen by a psychiatrist before the next psychiatrist sick call, or cause the inmate to be transferred to a hospital for evaluation.

For inmates who are found to be at risk of suicide, the suicide risk assessment shall be used to determine the level of suicide precautions necessary in the immediate term (e.g., constant observation), and whether the inmate needs to be transferred to an in-patient psychiatric facility or hospital in lieu of suicide watch/suicide precautions at the Jail.

When a reason that a person is placed in a safety cell is due to suicide risk or if the person has a documented mental illness, the inmate must be evaluated by a Qualified Mental Health Professional as soon as possible.  If a Qualified Mental Health Professional

is on site at the time that the inmate is placed in the safety cell, the Qualified Mental Health Professional must evaluate the inmate as soon as possible, but no later than four (4) hours after placement.  If the suicide risk assessment is conducted by a Qualified Mental Health Professional, the Qualified Mental Health Professional can evaluate the inmate at the same time he or she conducts the risk assessment.  If a Qualified Mental Health Professional is not on site at the time that the inmate is placed in the safety cell, a Qualified Mental Health Professional must evaluate the inmate within two (2) hours of the start of the next shift of a Qualified Mental Health Professional.  After the evaluation by a Qualified Mental Health Professional, the Qualified Mental Health Professional shall, if necessary, timely consult with the psychiatrist, in person or by phone.

All inmates placed in safety cells shall be evaluated at least once every six (6) hours by medical staff and at least once every twelve (12) hours by a Qualified Mental Health Professional.

Defendants recognize that the goal is to have the inmate remain in a safety cell for the shortest possible amount of time.  Every twelve (12) hours, custody, medical, and mental health care staff must review whether it is appropriate to retain an inmate in a safety cell or whether the inmate can be transferred to a less restrictive housing placement.

An inmate who has been placed in a safety cell for twenty-four (24) consecutive hours or for thirty-six (36) hours in any one-hundred-and-twenty (120) hour period must either be transferred to a less restrictive setting or transferred to an inpatient mental health facility or to a hospital emergency room for assessment and care.  In addition, an inmate may not be placed in a safety cell more than two times in any one-hundred-and-twenty (120) hour period.  If Defendants seek to place an inmate in a safety cell for a second time within any one-hundred-and-twenty (120) hour period, Jail medical or mental health staff shall consult with a psychiatrist regarding that placement.

An arriving inmate that is unable to care for his/her personal needs despite being provided food, clothing, and shelter by the Jail, shall not be maintained in a safety cell, and

AMENDED CONSENT DECREE

[3284355.3]

1  instead shall be immediately transferred to a hospital for treatment.

2      A psychiatrist or Qualified Mental Health Professional may authorize the release of

3  an inmate from a safety cell.  The order authorizing the release of an inmate from a safety

4  cell shall, if appropriate, include instructions regarding transitioning the inmate from

5  suicide precautions or suicide watch.

6      An inmate released from a safety cell or a step-down cell to housing will be seen at

7  the first mental health sick call following their release and at least two (2) additional times

8  within seven (7) days of their release.

9      Defendants shall clean safety cells at least every twelve (12) hours when occupied,

10  unless it is not possible to do so because of safety concerns, and when an inmate is

11  released from a safety cell.  Defendants shall indicate on the safety cell log when an

12  occupied safety cell is cleaned.

13      Defendants shall not close the shutters to the windows on the safety cell doors.

14  Defendants may, upon request of a prisoner in a safety cell or if circumstances otherwise

15  warrant, cover up to half of the window on a safety cell door in order to protect the privacy

16  of the inmate in the safety cell or inmates in other parts of the booking area.  If Defendants

17  cover any part of a window on a safety cell door, Defendants shall document the reasons

18  on the safety cell check sheet.  Defendants shall never cover or obstruct the windows at the

19  back of the safety cells.

20      Inmates held in safety cells shall be offered food at least three times within a 24-

21  hour period.  Inmates held in safety cells shall be provided water with each meal and upon

22  request.  Defendants shall record on each inmate's safety cell log each time the inmate is

23  provided with or declines an offer of food or water.

24      **D.      "Step-Down" Cell**

25      Defendants shall, by no later than 150 days after signing this agreement, make all

26  changes necessary to use one of the sobering cells in the Jail as a "step-down" cell.  The

27  purpose of the step-down cell is to house inmates who, because of their risk of suicide,

28

[3284355.3]

require increased monitoring and a suicide-safe environment, but do not require housing in a safety cell.  For purposes of this Amended Consent Decree, the step-down cell is a less-restrictive setting than a safety cell.  The step-down cell shall be free of suicide hazards. Defendants shall, either by constructing a surface on which inmates can sleep or by providing an alternative sleeping surface, ensure that all inmates placed in the step-down cell have a sleeping surface off of the ground.

Custody staff must visually observe each inmate who is placed in the step-down cell at least once every thirty (30) minutes.  The observations must be conducted at irregular and unpredictable intervals and must be documented.

All inmates placed in the step-down cell shall be evaluated at least once every six (6) hours by medical staff and at least once every twelve (12) hours by a Qualified Mental Health Professional.

Inmates may be housed in a step-down cell for more than twenty-four (24) consecutive hours so long as every twenty-four (24) hours a Qualified Mental Health Provider, after consulting with the psychiatrist, agrees to continued placement in the step-down cell.  However, if an inmate has been housed for one-hundred-and-twenty (120) consecutive hours in a combination of safety cells and the step-down cell and cannot be returned to a setting in the Jail that is less restrictive than the step-down cell, he or she shall be immediately transferred to an inpatient mental health facility or to a hospital emergency room for assessment and care.

### E.     Temperature, Lighting and Insect Control

Unless there is an equipment malfunction, the temperature of the Jail shall be maintained so that the maximum temperature does not exceed 80° and the minimum temperature is not less than 63°.  If the heating or cooling equipment malfunctions, prompt action shall be taken to remedy the defect.  Humidity and pollution must be controlled in the air.

The windows within the Jail shall remain uncovered by any material which prevents

[3284355.3]

1  or impedes the passage of light.  Adequate lighting for reading without strain must be

2  maintained during the day in the cells, tanks, and day rooms.  Night lighting shall not be so

3  bright so as to hinder sleep.

4      Professional pest, vermin, and mosquito control shall continue on a monthly basis.

5  **F.      Fire Safety**

6      Fire equipment must be available and accessible to the Correctional Officers, and

7  personnel must be trained in its proper use.

8  **G.      Maintaining Habitable Accommodations**

9      Each inmate shall have a mattress, sheet, and a blanket and shall have access to a

10  reflective surface usable as a mirror.  Each cell in Administrative Segregation shall have a

11  table, chair, bed, sink, and light.  All inmates shall have access to materials to clean their

12  cell at least twice per week, unless a particular inmate has been identified as presenting a

13  serious risk of harm to himself or herself.  Correctional Officers shall respond promptly to

14  requests for repairs or replacements, such as light bulbs.  Upon request, coats and extra

15  blankets shall be made available.  Drinking fountains must be kept in a sanitary fashion.

16  Mattresses must be sterilized, as necessary, to prevent the spread of lice.  Except as

17  necessary for the safety and security of the Jail, the windows within the Jail shall remain

18  uncovered by any material which prevents or impedes the passage of light.

19  **H.      Environmental Health Evaluations**

20      Defendants shall develop a plan to maintain the safety and security of the Jail as it

21  pertains to environmental hazards and dangers, including floods, fires, and earthquakes,

22  and to take appropriate measures in response thereto.

23      Health personnel must also regularly evaluate the environmental health situation in

24  the Jail.  Their recommendations must be duly considered and, if reasonable, implemented.

25  **I.      Inmate's Personal Hygiene**

26      Inmates shall be permitted to shower every other day in accordance with Title 15,

27  CCR., § 1266.  Clothing exchange shall be made in accordance with Title 15, CCR.,

28

[3284355.3]

§1262.  Clean towels and other clothes will be provided a minimum of one (1) time per week in accordance with Title 15, CCR., § 1271.

If an inmate cannot afford personal hygiene items such as toothbrush, toothpaste, combs, shampoo, soap, tampons and sanitary napkins for women, and shaving equipment for men, these items will be provided to them in accordance with Title 15, CCR., § 1265.

### J.     Food

Nutritious and tasty food must be provided to inmates.  The minimum nutritional standards set out in Title 15 of the California Administrative Code §§ 1240 *et seq.*, and as modified by a licensed or registered dietitian, must be achieved.  Meals must be provided three (3) times in each twenty-four hour period.  If more than fourteen (14) hours elapse between meals, supplemental food in an amount of at least 500 calories must be served.

Menus shall be planned one (1) month in advance, and they must provide a variety of foods to prevent repetitive and monotonous meals.  Food shall be served so that hot foods are served reasonably warm and cold foods are served reasonably cool.  Sanitation and food storage shall comply to standards set forth in California Health and Safety Code §§ 28520 *et seq.*

Provision shall be made to immediately comply with any special diet prescribed for an inmate by any health care person.  A licensed or registered dietitian shall plan the following special diets for Jail inmates:  (1) a low carbohydrate diet; (2) a low salt diet; (3) a pre-natal diet; (4) a post-natal diet; and (5) a low-fat diet.  These special diets shall be provided to the inmates as prescribed by the Jail nurse or the treating physician.

### K.     Evaluation

The county health officer or his or her designate, along with a Jail Supervisor, at least annually, shall inspect the Jail for sanitation and the adequacy of food, clothing, and medical care.  Good faith efforts shall be made to implement reasonable recommendations by supervisor or health care personnel.

[3284355.3]

## VII.   <u>VISITATION</u>

There shall be at least two (2) visitations available per week in accordance with Title 15, CCR., § 1062.  There shall be no age restriction placed on visitors, except that Correctional Officers may require that visitors under the age of eighteen (18) be accompanied by a parent, responsible relative, or guardian.  A thirty (30) minute time limit may be imposed on visits if there are other visitors waiting to see inmates.  However, a visitor who is asked to leave after thirty (30) minutes may wait his or her turn for such additional visits as time permits.  Inmates may have more than one visitor at one time if space permits and no others are waiting to visit.  A sign shall be posted in the lobby of the Sheriff's Department which lists visiting hours and explains visiting procedures.

## VIII.   <u>DUE PROCESS IN DISCIPLINE</u>

Defendants shall maintain written rules and procedures governing the conduct of inmates within the Jail.  Those rules and procedures shall explain in simple terms inmate's rights, what inmates are not allowed to do while incarcerated, what punishments are possible for violating specific prohibitions, and what procedures must be followed in imposing discipline.

### A.   **Effective Communication for Inmates with Disabilities and Limited English Proficiency**

The Jail shall ensure effective communication is achieved and documented when there are disciplinary or due process proceedings involving an inmate with a hearing, vision, and/or speech impairment; developmental disability and/or learning disability, and/or Limited English Proficiency (LEP).  In such interactions, the inmate's primary method of communication shall be used.  If necessary, the inmate's secondary method of communication shall be used with the exception of inmates needing a Sign Language Interpreter (SLI).

Accommodations may be facilitated by sign language interpretation, certified bilingual health care or custody staff, other certified contracted language interpreters,

[3284355.3]

assistive devices, or other methods of assistance and accommodation, including the use of Language Line or video remote interpreting.

The Jail shall notify inmates of what language assistance is available during any disciplinary or due process proceeding.

**DISCIPLINE:**  The purpose of imposing discipline within the Jail is to maintain order and control.  Disciplinary action is reserved for those inmates who refuse to conform to the aforesaid written rules and procedures.  It will be utilized when appropriate communication with the inmate has failed to maintain order and control.

### B.      Major and Minor Violations

Rule violations may be classified as major if the inmate's behavior is likely to cause a direct danger to the health and safety of other inmates, the staff, or the institution.  Other rule violations are minor.

1.      Violations involving control of contraband, damaging County property, escape attempts, incidents of physical violence, persistent creation of disturbances which interfere with the function of the Jail or welfare of other inmates, starting fires, assault, making a false report of an emergency, presence in an unauthorized area of the Jail, or any violation of a criminal statute may be charged as a major or minor violation.  Repeated minor violations or minor violations coupled with conduct or words reasonably indicating a risk to the safety or security of the Jail may be charged as a major violation.

2.      All other violations of the Jail rules and procedures are minor violations

3.      Repeated major violations shall be reported as new and separate violations.

### C.      Disciplinary Measures

1.      Minor violations shall not affect the inmate's release date.  Minor violations may be punished by one of the following sanctions:

a.      Verbal reprimand.

b.      Written reprimand.

c.      Relocation to another cell of the same or similar classification.

d.      Revocation of one or two of the following for up to one week:  access to the exercise yard, movies, store call, visitation, the library, or the educational program. Individuals may be denied the opportunity to watch television for up to one week.

2.      Major violations shall be punished by one or more of the following sanctions, in addition to any counseling of the inmate deemed necessary by the Jail Supervisor:

a.      Any of the sanctions authorized for punishment of a minor violation.

b.      Loss of access to the exercise yard, movies, store call, the recreation library, or visitation for up to thirty (30) days.

c.      Loss of good-time credits if the inmate is sentenced.  This loss shall not apply to accrued pre-sentence good-time.

3.      No inmate shall be subjected to cruel, corporal, or unusual punishment or lack of care which injures or impairs the health of the inmate.  No inmate shall suffer any deprivation, as a punitive measure, of clothing, bedding, at least two meals a day, or normal hygienic implements required for basic sanitation.

**D.      Disciplinary Procedures**

1.      Whenever a Correctional Officer becomes aware of a possible rule violation, he or she may report the situation in writing to the Jail Supervisor.  If any discipline is to be imposed other than a reprimand this report must be in writing and must be received by the Jail Supervisor within forty-eight (48) hours, exclusive of Saturdays, Sundays, or holidays, of the alleged violation.

2.      If a minor violation is charged, the Jail Supervisor may take action to evaluate the alleged violation.  If the Jail Supervisor chooses to evaluate the alleged violation for possible imposition of punishment, he must give the inmate an opportunity to explain his or her side of the alleged violation.  If the Jail Supervisor finds the alleged violation did occur, he may institute punishment as authorized for minor violations.  Such action must be taken within seventy-two (72) hours of the report of the violation.

AMENDED CONSENT DECREE

[3284355.3]

3.     If a major violation is charged, the Jail Supervisor shall review the incident within seventy-two (72) hours of receipt of the initial report, exclusive of Saturdays, Sundays, and holidays, to determine whether:

      a.     the matter should be treated as a major violation;

      b.     the matter should be treated as a minor violation; or

      c.     the matter should not be considered a violation.

4.     In the event that the Jail Supervisor determines that an inmate's behavior should be treated as a major violation, the inmate shall be entitled on request to a hearing before the Jail Commander.  The inmate shall be provided with a copy of the initial report charging the alleged major violation and a copy of these disciplinary procedures at least twenty-four (24) hours prior to the time of the hearing, which shall be scheduled within seventy-two (72) hours of the request for hearing, unless time is waived by both the Sheriff's Department and the inmate.  The hearing shall be held under the following rules:

      a.     The inmate has a right to be present and speak, submit signed statements or declarations, evidence, and witnesses, if available (not to exceed three (3) witnesses), consisting of all relevant information about the alleged offense, as determined by the Jail Commander.

      b.     The inmate may select another inmate or member of staff as a counsel substitute to represent the inmate at the hearing.

      c.     The Jail Commander shall make a determination within twenty-four (24) hours of the hearing as to the truth of the charge and, if true, the nature of the punishment to be imposed.  The determination shall be made within ninety-six (96) hours of the request for hearing.

5.     An appeal may be taken by an inmate of discipline imposed for a major violation if the punishment applied is:

      a.     Loss of more than five (5) days good-time credit.

      b.     Loss of access to store call, the recreation library, the roof-top

AMENDED CONSENT DECREE

[3284355.3]

exercise yard, or visitation for a time exceeding one (1) week, or loss of trusty status for a time exceeding one (1) week.

6.      An appeal must be presented to a Correctional Officer on a form which shall be available for that purpose within twenty-four (24) hours of the report of the Jail Commander being supplied to the inmate.  The inmate, with the aid of counsel substitute, shall prepare a statement in writing of the grounds for appeal.  The inmate may appear at the appeal hearing with counsel substitute to make a statement, not exceeding fifteen (15) minutes in length, but no other evidence may be presented at the appeal hearing.  The report of the Jail Commander and all other evidence or items introduced at the hearing shall be before the appeal panel.  The appeal shall be heard by a panel consisting of the Undersheriff, and an officer within the Sheriff's Department of the rank of Sergeant or higher (designated by the Sheriff)

7.      The appeal shall be conducted within three (3) days of the filing of the notice of appeal at a time set by the appeal panel.  The decision of the appeal panel shall be final and shall be rendered within forty-eight (48) hours of the conclusion of the appeal.

**E.      Reporting of Disciplinary Actions**

1.      Action taken on minor violations other than verbal reprimands shall be reported on a form which contains the date of the offense, a brief factual description of the offense, together with a notation of the rule which is violated, and the nature of the punishment administered.  A copy of this report shall be filed and retained in the Jail and a copy given to the inmate within twenty-four (24) hours after the Jail Supervisor's decision.

2.      At the conclusion of any hearing or appeal on a major violation a report shall be filed which contains the date of the offense, a brief factual description of the nature of the offense, the rule violated, a recitation of the evidence relied upon by the Jail Commander and/or appeal panel to support the charge violation, a list of the witnesses who presented evidence at the hearing, a list of any other evidence presented at the hearing, and the punishment administered.  A copy of the report of a major violation shall be filed and

[3284355.3]

retained within the Jail and a copy given to the inmate within twenty-four (24) hours of a decision at each level.

**F.     Special Consideration**

1.     If the Jail Supervisor believes that an inmate's mental illness was a significant factor in causing the minor or major violation, the inmate shall be referred for a mental health evaluation and possible treatment.

2.     Should the Jail Supervisor charge a person determined to have a mental illness which caused or contributed to the violation, the Jail Supervisor must consult with a Qualified Mental Health Professional prior to imposing any sanction in order to determine whether the proposed sanction is likely to exacerbate an inmate's mental health symptoms and expose the inmate to an increased risk of danger.  If there is a danger that a proposed sanction will exacerbate an inmate's mental illness or expose him to increased risk of danger, an alternate sanction shall be imposed, if at all, unless safety security reasons dictate otherwise.

3.     In the event that any incident could also be subject to a criminal prosecution and the matter is referred to the District Attorney's Office, disciplinary proceedings shall be suspended until a determination has been made that the District Attorney will not prosecute the matter.  No punishment on the incident referred shall be imposed during any such suspension, and the required time limits shall be tolled during that period.

4.     No punishment shall be administered without conformance to the procedures herein, other than in the form of reprimand or warning.  However, if it is necessary due to Jail security or the safety of persons within the Jail to relocate any inmate charged with an offense to a less desirable location within the Jail, the hearing on the offense charged must be held within thirty-six (36) hours exclusive of Saturdays, Sundays, and holidays, unless the Sheriff's Department and the inmate both waive, in writing, this time limit.

**IX.     ADMINISTRATIVE SEGREGATION AND SEGREGATED HOUSING**

Administrative Segregation is a housing classification decision.  Every assignment

AMENDED CONSENT DECREE

[3284355.3]

of a person to Administrative Segregation shall be based on a written report providing an explanation of the facts and circumstances requiring the segregation.  This report shall be written as soon as possible and in no case later than forty-eight (48) hours after the initiation of the assignment to Administrative Segregation.  Said reports shall be retained.

Custody staff shall conduct appropriate health and welfare checks on all prisoners placed in Segregated Housing sufficient to ensure safety and security and minimize the risk of suicide.

Inmates moved from the general population to Segregated Housing who either (a) have not yet received their 14-day Initial Health Assessment or (b) have received their 14-day Initial Health Assessment and provided a "yes" answer to any of the questions highlighted in Exhibit F will be screened for suicide risk by a Qualified Mental Health Professional as soon as possible but no later than 48 hours after placement.

A Qualified Medical Professional shall conduct rounds for those in Segregated Housing three times per week.

A Qualified Mental Health Professional shall conduct rounds for those in Segregated Housing four times per week.

Assignment to Administrative Segregation shall not involve a deprivation of privileges other than those necessary to protect the welfare of inmates and staff.  Inmates in Administrative Segregation will have access to the normal group programs provided at the Jail such as NA/AA, religious services, etc., unless safety and security concerns require otherwise.  Every thirty (30) days, classification will conduct an individualized assessment regarding which inmates in Administrative Segregation may participate in group programs offered at the Jail, and, what, if any, restrictions apply to inmate participation, and will document the individualized assessment in the inmate's file.

Defendants shall not house inmates with serious mental illness in Administrative Segregation (A-Pod, S-tank) or the medical cells unless those inmates demonstrate a current threat to Jail security, inmate safety, or officer safety, as documented by custody

[3284355.3]

1  staff, that prevents them from being safely housed in less restrictive locations.  Inmates

2  shall not be housed in Administrative Segregation solely because they have a mental

3  illness.

### A.  Out-Of-Cell Time and Other Recreation and Treatment for Prisoners in Segregated Housing

6  Defendants shall maximize out-of-cell time for prisoners in Segregated Housing.

7  Defendants shall offer inmates in Segregated Housing the use of their respective day

8  rooms or equivalent indoor recreation space continuously from 6 a.m. to 10 p.m.  All

9  inmates in Segregated Housing shall receive, at a minimum, one (1) hour out-of-cell time

10  in the day room or other indoor area per day.  After each inmate in a Segregated Housing

11  unit has been offered one (1) hour out-of-cell time during a given day, the remaining hours

12  of day room availability shall be offered to the inmates in the Segregated Housing unit in a

13  manner such that the inmates are offered approximately equal additional out-of-cell time

14  measured on a weekly basis.  Defendants shall document the time that each prisoner in

15  Segregated Housing spends out-of-cell.

16  To the maximum extent possible, Defendants shall offer each inmate in Segregated

17  Housing the opportunity for out-of-cell time with as many other inmates as possible, so

18  long as concerns over safety and security do not prevent the inmate from being placed in

19  the same space as other inmates.

20  All prisoners in Segregated Housing shall receive a minimum of at least fifteen (15)

21  combined hours of indoor and outdoor out-of-cell time per week.  In addition, the Jail shall

22  undertake reasonable and good faith efforts to provide additional out of cell time.  This

23  may include, but is not limited to, additional day room use, additional use of the outdoor

24  recreation yards, programing time, or mental health contacts.

25  Within one-hundred-and-eighty (180) days of the signing of this Amended Consent

26  Decree, Defendants shall take all necessary steps to obtain radios to be provided to inmates

27  in Segregated Housing.  Issuance of radios is deemed a deterrent to sensory deprivation

28

[3284355.3]

1    experienced by some inmates in Segregated Housing.  One radio shall be provided per

2    Segregated Housing cell.  The Jail will develop a policy regarding use of the radios, which

3    will include the right of custody staff to remove the radio from a cell and/or an inmate for

4    safety, security or disciplinary reasons.

5        Within ninety (90) days from the date that Defendants activate the Jail building

6    being constructed with funds pursuant to SB 863, the parties shall meet and confer

7    regarding developing a program to provide inmates with serious mental illness who are

8    held in Segregated Housing with out-of-cell mental health treatment consisting of

9    therapeutic/educational treatment and programming.

10       Inmates in Administrative Segregation shall have access to a telephone, a television

11   and a bicycle exercise machine.  Board games, cards, and other recreation equipment shall

12   be maintained and available to administratively segregated inmates upon request.

13       Defendants shall strive to limit the placement of inmates in Segregated Housing for

14   prolonged periods of time.  An inmate may request a review of classification or placement

15   in Segregated Housing by completing an inmate request slip.  Classification shall also

16   review the placement of inmates in Segregated Housing at least once a month, though

17   more frequently if necessary for certain categories of inmates, such as detainees held by

18   Immigration and Customs Enforcement, or individuals with serious mental illness.

19   Classification shall also consult medical staff concerning each inmate's progress toward

20   the goal of placing the inmate in general population.  If other reasonable housing options

21   exist that will provide for the safety of the inmate, the inmate should be moved out of

22   segregation.  In reviewing an alternative housing decision, the safety of the inmate shall

23   receive the utmost consideration.

24   **X.    INMATE GRIEVANCE PROCEDURE**

25       The provisions of an inmate grievance procedure shall be provided to inmates at

26   booking and shall be posted in as many locations as is necessary for all inmates to be

27   aware of the procedures.  The inmate grievance procedures shall be in conformity with the

28

[3284355.3]

following.

### A.    Purpose and Definitions

#### 1.    Statement of Purpose

The purpose of the formal grievance procedure is to assure that inmate complaints are given full opportunity for fair hearing, consideration, and resolution.  The procedure is intended to supplement, not to replace, informal methods of dispute resolution.

#### 2.    Grievance Defined

A grievance can be any complaint regarding Jail conditions, procedures, food, failure to accommodate disabilities, or compliance with any portion of this Amended Consent Decree.  If an inmate wishes to complain about discipline, he or she should do so utilizing the mechanisms described in Section VIII above.  If the inmate wishes to complain about an alleged failure to comply with the inmate discipline procedures, he or she may do so in a grievance.

If a grievance concerns an allegation of a violation of a Sheriff's Department policy or state or federal law by an employee of the Jail which could result in formal discipline (i.e., reprimand, suspension, termination), it shall be referred to the Professional Standards Unit of the Sheriff's Department.  Internal Affairs shall prepare a written report on its findings for the Undersheriff.  The Undersheriff shall decide on a course of action, which must be put in writing with a copy going to the inmate.  If the grievant is not satisfied with the disposition by the Undersheriff, he or she can then proceed with a normal grievance as hereinafter described.

### B.    Jail Grievance Procedure

1.    Any inmate may file a grievance by submitting an inmate request to any Correctional Officer or to the Jail Supervisor on forms which shall be provided for that purpose.  No reprisals will be taken against them for using the grievance procedure or against other inmates assisting in pursuing a solution to the grievance.  Inmates shall be informed of this policy prohibiting such reprisals.  Grievance forms shall be made readily

AMENDED CONSENT DECREE

[3284355.3]

available to inmates in every housing unit in the Jail.

2.      The Jail Supervisor shall obtain as much information as possible regarding the grievance and shall attempt to resolve it to the satisfaction of the grievant within forty-eight (48) hours.  If the grievant is satisfied with the resolution proposed by the Jail Supervisor he or she may sign a statement that the grievance has been satisfactorily resolved and the grievance shall proceed no further.

3.      If the grievance has not been resolved within forty-eight (48) hours of receipt of the grievance, the Jail Commander shall conduct a grievance hearing within seventy-two (72) hours of receipt of the grievance.

a.      A grievance hearing shall be conducted by the Jail Commander unless he or she is the subject of the grievance in which case the Sheriff shall appoint a replacement who has the rank of Captain or higher.

b.      During the hearing the inmate and witnesses will be heard and all pertinent information will be reviewed.  The inmate may be assisted by another inmate or a member of the Sheriff's Department willing to act as an inmate's representative.  The representative shall be entitled to attend and participate in the grievance hearing as well as any informal conferences or reviews in which the grievant participates.

c.      To provide a full opportunity for expression, the hearing must bring together the inmate and the person about whom he or she is complaining, or someone to speak for the policy or condition that is the subject of the grievance.

d.      An inmate with an emergency grievance (i.e. one which requires immediate action to avoid injury or continued problems) shall be responded to on an expedited basis (i.e. immediately).

4.      The Jail Commander shall resolve the grievance.  A written disposition shall be given to the grievant within seventy-two (72) hours of the completion of the hearing.

**C.      Grievance Appeals**

If the inmate is not satisfied with the disposition of the Jail Commander, he or she

may appeal to a Grievance Panel consisting of the Undersheriff and an officer within the Sheriff's Department of the rank of Sergeant or higher (designated by the Sheriff).  Such appeals must be presented on a form provided by the Sheriff's Department within seven (7) days of receiving the written disposition from the Jail Commander.  Within seven (7) days thereafter a hearing shall be held at which the grievant and/or his or her representative shall be given the opportunity to explain the grievance and urge that appropriate action be taken.  The Grievance Panel may request additional evidence or testimony from anyone it deems appropriate.

The Grievance Panel shall submit a written disposition of the appeal and a brief explanation of the reasons therefor to the inmate within seventy-two (72) hours after the completion of the grievance appeal hearing.

### D.    Records

Copies of all grievances, appeals, and the disposition thereof shall be retained by the Jail for at least one (1) year after their completion.

## XI.    ACCESS TO LEGAL MATERIALS

1.    The law library shall have adequate material to support the Jail population as set forth below.  Sufficient writing implements, paper, photocopiers and related office supplies shall be provided to inmates to prepare documents for legal proceedings, special correspondence or legal mail.  The law library shall also provide access to two-hole punches and folders

2.    The latest editions of the following books shall be maintained within the law library for inmate use in hard copy or in electronic format:

        a.    West's Annotated California Penal Code;

        b.    United States Code Annotated ; Constitution, including amendments;

        c.    United States Code Annotated; Title 42, §§ 1891-2010;

        d.    United States Code Annotated; Title 18;

        e.    United States Code Annotated; Title 28, §§ 2241-2255 (Federal Rules

[3284355.3]

1   of Appellate Procedure, Rules of Supreme Court);

2         f.     Rules of local federal district courts;

3         g.     *Black's Law Dictionary*;

4         h.     Cohen, Morris L., *Legal Research in a Nutshell* (2d ed.) St. Paul,

5   West. 1971, or a comparable publication;

6         i.     *The United States Law Week* or the *Criminal Law Reporter*;

7         j.     West's *Federal Rules of Criminal Procedure*;

8         k.     Israel, Jerold I. and Wayne R. LaFave, *Criminal Procedure in a*

9   *Nutshell*, St. Paul; West. 1971, or a comparable publication;

10        l.     Potts, James L., Prisoners' *Self-Help Litigation Manual*.  The National

11  Prison Project of the American Civil Liberties Union Foundation, 1976, or a comparable

12  publication;

13        m.     *Jailhouse Lawyers Manual: How to Bring a Federal Suit Against*

14  *Abuses in Prison*, San Francisco (558 Capp St., 94110); Prison Law Collective 1973, or a

15  comparable publication;

16        n.     Krantz, Sheldon.  *Cases and Materials on the Law of Corrections and*

17  *Prisoners' Rights*, St. Paul; West. 1973, or a comparable publication;

18        o.     *A Manual on Habeas Corpus for Jail and Prison Inmates*; written and

19  compiled by the Prison Law Project, Berkeley, California (P.O. Box 673, 64701); Legal

20  Publications (1973), or a comparable publication;

21        p.     *Prison Law Monitor*; and

22        q.     *How to Use a Law Library: A Short Course for Laymen*.  San

23  Francisco.  People's Law School (558 Capp St., 94110) 1973, or a comparable publication.

24        r.     California Administrative Code, Subchapter four (4) of Title 15,

25  Minimum Standards for Local Detention Facilities, §§ 1000 *et seq.*

26        3.     The Jail handbook shall contain a list of the books contained in Section B

27  (above). Legal materials required by the applicable ICE detention standards shall be

28

maintained in the law library. Inmates shall be informed that they are permitted to use the law library within twenty-four (24) hours upon request.

4.    The Jail shall designate a facility law library coordinator to be responsible for inspecting legal materials, updating them, maintaining them in good condition and replacing them promptly as needed.

5.    Inmates with disabilities, LEP inmates and illiterate inmates who wish to pursue a legal claim related to immigration proceedings or habeas proceedings, and who request assistance or otherwise indicate difficulty with the legal materials, must be provided assistance beyond access to a set of English-language law books. The Jail shall establish procedures to meet this requirement, such as:

a.    having the Jail's law library coordinator assist the inmate's legal research;

b.    permitting inmates to receive assistance from other inmates in using the law library;

c.    assisting in contacting pro bono legal-assistance organizations from an ICE/ERO provided list; and

d.    in the case of inmates with disabilities, providing reasonable accommodations and or auxiliary aids and services identified through the Jail's reasonable accommodation process.

## XII.    <u>ACCESS TO COURTS</u>

Inmates shall be informed that they may correspond, confidentially, with State and Federal Courts, any member of the State Bar or holder of public office, and the Board of Corrections, provided that the Jail may open and inspect such mail to search for contraband. Forms shall not be used which purport to authorize the Sheriff or anyone else to open, censor, and read incoming or outgoing mail to or from the above enumerated persons or institutions.

Inmates may correspond, confidentially, with the Jail Supervisor and the Jail

1   Commander.

2          Inmates who are without funds shall be permitted at least two postage-free letters

3   each week to permit correspondence with family members and friends.  Inmates who are

4   without funds shall be permitted an unlimited number of postage-free letters to his or her

5   attorney and to the Courts.

6          Inmates shall be allowed to receive incoming calls from out-of-town attorneys

7   subject to reasonable verification that the attorney represents the inmate and only if it is

8   not practical for the inmate to immediately call the attorney back on the inmate telephone.

9          There shall be two rooms regularly available to attorneys to interview their clients

10  between the hours of 8:00 a.m. and 4:00 p.m.  Rooms must be such that the confidentiality

11  of the attorney/client relationship is protected.

12         Inmates shall be permitted to shave, bathe, and comb their hair prior to all court

13  appearances, provided that the Jail Supervisor or a Correctional Officer has been informed

14  of a court appearance at least twenty-four (24) hours in advance.  Inmates shall be allowed

15  to wear street clothes for court appearances, except arraignments and pre-trial motions, if

16  provided by the inmate.  An inmate's family and friends shall be permitted to bring street

17  clothes to the Jail for use by the inmate.  Inmates shall be verbally informed of these

18  procedures at the time of their booking.

19  **XIII.   INMATE EDUCATION AND VOCATIONAL TRAINING PROGRAM**

20         **A.      Education and Vocational Training Plan**

21         The Sheriff's Department shall maintain an education and vocational training plan.

22  This plan shall describe in detail a program which fully complies with Section 1061 of

23  Title 15 of the California Administrative Code and the terms of this Amended Consent

24  Decree as hereinafter set forth.

25         **B.      Minimum Requirements of the Inmate Education and Vocational
                     Training Plan**
26

27         The plan must provide for a basic education and vocational training program.  This

28

[3284355.3]

1  program shall be based on the educational needs of the inmates and shall include, at a

2  minimum, the following components:

3          1.      high school courses leading to a high school degree or its equivalent

4  (providing that there are a sufficient number of inmates who wish to participate);

5          2.      life skills and or drug/alcohol recovery; vocational training; and

6          3.      utilization of outside instructors and county personnel as instructors, where

7  feasible and appropriate.

8          Currently, the Jail offers the following programs: For female inmates –

9  Keyboarding, ACTS class, Celebrate Recovery, Sewing, Anger Management/Domestic

10 Violence, Bible Study, and GED; and for male inmates – Father's First, Anger

11 Management/Domestic Violence, ACTS Class, Church services, Treatment Ready, and

12 GED.  The parties agree that these programs meet the requirements of this section.

13         On a yearly basis the Jail Commander shall consult with appropriate personnel from

14 the Yuba Community College District, the Marysville Joint Unified School District,

15 Gateways Projects, Inc., and the Board of State and Community Corrections about the

16 availability of their resources and expertise for use in the Jail's education and vocational

17 training program.  The Sheriff's Department shall make a good faith attempt to incorporate

18 these suggestions and resources, as well as other available community resources, into the

19 education and training program.

20 **XIV.   COMPLIANCE WITH TITLE 15 OF THE CALIFORNIA**
        **ADMINISTRATIVE CODE**
21

22         Defendants shall also comply with all provisions of Title 15 of the California

23 Administrative Code which specifies the minimum jail standards of the California Board

24 of State and Community Corrections, §§ 1000 *et seq.*

25 **XV.    MONITORING**

26         All records and documents which relate to compliance with this Amended Consent

27 Decree, including records and documents maintained or generated by or in the possession

28

AMENDED CONSENT DECREE

[3284355.3]

1   of the Jail's contracted medical and mental health provider, shall be kept by the Jail and

2   made available within a reasonable time upon request by Class Counsel.  Defendants will

3   also produce certain documents identified in **Exhibit G** to Class Counsel on a quarterly

4   basis.  If, after the effective date of this Amended Consent Decree, either party wishes to

5   modify the list of documents that are produced on a quarterly basis, the parties shall meet

6   and confer on the issue.

7        Class Counsel and their experts shall be entitled to an inspection of the Jail upon

8   written notice provided at least twenty-four (24) hours prior to said inspection.  For the

9   first two (2) years after the District Court enters this Amended Consent Decree, no more

10  than three (3) such inspections may be performed in one (1) year without prior District

11  Court approval.  For the period starting two (2) years after the District Court enters this

12  Amended Consent Decree until the Amended Consent Decree is terminated, no more than

13  two (2) such inspections may be performed in one (1) year without prior District Court

14  approval.

15       Class Counsel shall be allowed to interview any inmate within the Jail about

16  conditions within the Jail unless that particular inmate states that he or she does not want to

17  speak to Class Counsel.  Visits by the attorneys to speak with inmates shall be handled the

18  same as all attorney visits.  Students enrolled in the King Hall Civil Rights Clinic at the

19  University of California - Davis School of Law shall be permitted to conduct attorney

20  visits with inmates without their supervising attorney being physically present at the Jail so

21  long as the Supervising Attorney for the Clinic sends, in advance and in writing, the names

22  of any Clinic students to the Jail Captain and Jail Lieutenant.

23       The members of the Yuba County Grand Jury who serve on the Court and Law

24  Enforcement Committee shall be provided each year with a copy of the Amended Consent

25  Decree so that they will know the minimum legal standards for conditions of confinement

26  in the Jail.  The Grand Jury shall be requested to do an analysis of whether the Jail is in

27  conformity with all provisions of the Amended Consent Decree and include that analysis

28

[3284355.3]

1  in its yearly report.

2          The Sheriff shall be responsible for reporting to Class Counsel any material

3  variances between the procedures and practices in the Jail and the provisions of this

4  Amended Consent Decree.  Such variances must be reported in writing within ten (10)

5  days of becoming aware of the variance.

6          At the time of booking, each new arrestee shall be given a copy of a booklet which

7  accurately summarizes the provisions of this Amended Consent Decree.  Spanish

8  translations of this booklet must be available.  If an individual cannot read the booklet,

9  good faith efforts must be made to read or otherwise inform the inmate of the contents of

10  the summary.

11          Copies of this Amended Consent Decree shall be available upon request and in the

12  library.

13  **XVI.   MISCELLANEOUS RELIEF**

14          Should any of the positions mandated by this Amended Consent Decree become

15  vacant, the Jail shall make good faith efforts to fill the position and shall designate a

16  person or persons to temporarily fulfill the job duties required by the position.

17          The parties shall agree on a mechanism for promptly addressing concerns raised by

18  Class Counsel regarding individual class members and emergencies.

19          Defendants shall provide notice of the existence of the Amended Consent Decree

20  and the names and addresses of class counsel (1) on a poster, prominently displayed in

21  English and Spanish in the booking area in a place where all prisoners and ICE detainees

22  booked into the Jail can see it, in all housing units, and in the library and (2) in the Jail

23  Handbook.

24  **XVII.   PROCESS FOR APPROVAL OF AMENDED CONSENT DECREE**

25          **A.     Consent to Proceed Before Currently-Assigned Magistrate Judge**

26          Pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and Local Rule 305, the parties

27  stipulate and consent to have this case transferred to the currently assigned magistrate

28

[3284355.3]

judge who will preside over this case for all purposes.  The magistrate judge shall conduct all further proceedings in this case, including presiding over any motions related to the approval and enforcement of this Amended Consent Decree, with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed.

### B.   Court Approval

The Amended Consent Decree will be subject to approval by the Assigned Magistrate Judge (the "Court" or "District Court").

### C.   Preliminary Approval by the District Court

Within forty-five (45) days of signing the fully executed Amended Consent Decree, Plaintiffs and Defendants will jointly submit a request to the District Court to: (i) preliminarily approve the Amended Consent Decree, including a preliminary finding that the Amended Consent Decree satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A); (ii) direct notice to the Class; (iii) set forth procedures and deadlines for comments and objections to the Amended Consent Decree; (iv) schedule a fairness hearing; and (v) schedule a hearing on Plaintiffs' motion for attorneys' fees, litigation expenses, and costs incurred through the date of the signing of this Amended Consent Decree.

### D.   Notice to Class of Amended Consent Decree Pursuant to Federal Rule of Civil Procedure 23(e)

The Parties will jointly request approval by the District Court of notice pursuant Federal Rules of Civil Procedure Rule 23(e). To the extent the District Court determines that any modifications to the notice are required, the parties will make such modifications prior to distribution of the notice to the class.  Following the District Court's issuance of a preliminary approval order, the parties will provide notice of the proposed Amended Consent Decree, advising members of the Class of the terms of the proposed Amended Consent Decree and their right to object to the proposed Amended Consent Decree. Within seven (7) days after the District Court has issued a Preliminary Approval Order the notice will be posted: (1) on the County's official website (www.co.yuba.ca.us/); and (2) in all

[3284355.3]

1  Jail facilities operated by Defendants, including, but not limited to, in all dayrooms, all

2  medical clinic spaces, the visiting area, and the intake area.

3  **E.  Inmate Objections**

4  Inmates may object to the proposed Amended Consent Decree by submitting their

5  objection to the Court in writing no later than a date set by the District Court in this case

6  after preliminary approval of the Amended Consent Decree.

7  **F.  Fairness Hearing**

8  The Parties will jointly request that the District Court schedule and conduct a

9  fairness hearing to decide whether to grant approval to the Amended Consent Decree.  At

10  the fairness hearing, the Parties will jointly move for the District Court: (i) to grant final

11  approval to the Amended Consent Decree, including a finding that the Amended Consent

12  Decree satisfies the requirements of 18 U.S.C. § 3626(a)(1)(A) in that the Amended

13  Consent Decree is narrowly drawn, extends no further than necessary to correct the

14  violation of the Federal right, and is the least intrusive means necessary to correct the

15  violation of the Federal right of the Plaintiffs; (ii) to retain jurisdiction over the parties to

16  enforce the terms of the Amended Consent Decree until the date the Amended Consent

17  Decree terminates; and (iii) to address Plaintiffs' motion for attorneys' fees and costs.

18  **XVIII.  ATTORNEYS' FEES, COSTS, AND EXPENSES**

19  **A.  Past Attorneys' Fees, Expenses, and Costs for Monitoring and Enforcing Consent Decree and Negotiating Amended Consent Decree**

20

21  The parties acknowledge that Plaintiffs' counsel have incurred and will incur

22  attorneys' fees, litigation expenses, and costs related to monitoring the Consent Decree,

23  litigating issues related to enforcement of the Consent Decree, seeking remedial orders,

24  and negotiating this Amended Consent Decree.  As set forth in Section XVII, *supra*,

25  Plaintiffs will, contemporaneous with their filing of their motion for preliminary approval

26  of the Amended Consent Decree, submit a motion for attorneys' fees and costs seeking to

27  recover attorneys' fees and costs related to all work on this matter including monitoring the

28

[3284355.3]

1    Consent Decree, litigating issues related to the Consent Decree (including the Motion to

2    File a Supplemental Complaint), seeking remedial orders, and negotiating this Amended

3    Consent Decree ("fees and expenses").  Plaintiffs agree not to seek fees and expenses from

4    the Court in an amount above $1,100,000, for fees and expenses incurred through June 30,

5    2018.  Defendants agree not to oppose Plaintiffs' petition for fees and expenses up to that

6    amount for the period through June 30, 2018.  Plaintiffs reserve the right to petition the

7    Court for additional fees and expenses incurred from July 1, 2018 through final approval

8    of the Amended Consent Decree ("additional fees and expenses"). Plaintiffs' counsel agree

9    the lodestar for the additional fees and expenses will be calculated using $220.50 per hour,

10   the 2018 rate authorized by the Prison Litigation Reform Act (PLRA). Defendants reserve

11   the right to oppose any request by Plaintiffs for compensation for fees and expenses

12   incurred from July 1, 2018 through final approval of the Amended Consent Decree.  The

13   parties acknowledge that Court approval of the fees and expenses is required.

14
         **B.**    **Future Attorneys' Fees, Expenses and Costs for Monitoring and
                  Enforcing Amended Consent Decree**
15

16       The parties acknowledge that Plaintiffs' counsel has a right to request

17   reimbursement of reasonable attorneys' fees, expenses and costs incurred for monitoring

18   Defendants' compliance with the Amended Consent Decree.

19       Plaintiffs may petition the Court for an award of no more than $115,000 per year in

20   attorneys' fees, expenses and costs arising from monitoring compliance with the Amended

21   Consent Decree, including, but not limited to, inspections, negotiations, meet and confer

22   processes, review of documents, and correspondence with class members ("monitoring

23   work"), until termination of this Amended Consent Decree. The lodestar used for all

24   monitoring work shall be at the hourly rate then authorized by the PLRA. The monitoring

25   year will be deemed to begin the day after any Final Approval Order is entered.  The

26   parties acknowledge the need to take all necessary steps to make the monitoring process as

27   cost efficient as possible.  To that end, Defendant shall cooperate in good faith in

28

[3284355.3]

providing requested information to class counsel, including the quarterly documents required to be produced as set forth in this Amended Consent Decree, and Plaintiffs shall use the University of California at Davis School of Law Clinic as may be reasonable under the circumstances for monitoring.

If in a given year Plaintiffs believe additional reimbursement for monitoring work is required, the parties shall meet and confer to attempt to resolve the issue. If the issue cannot be resolved, then Plaintiff's counsel may file a motion to establish good cause for the need for additional reimbursement for monitoring work.

The $115,000 annual cap does not apply to litigation in the District Court or future appeals, if any. If Plaintiffs' counsel pursues litigation or appeal, a separate motion for attorneys' fees, expenses, and costs must be filed. Prior to doing so, the parties are to meet and confer and attempt to reach an agreement on the attorneys' fees, expenses, and costs.

The parties agree that Plaintiffs' counsel shall submit, on a semi-annual basis, requests for attorneys' fees, litigations expenses, and costs to Defendants to cover their reasonable fees and costs spent on monitoring work. Prior to submitting any application or motion for attorney fees, expenses, and costs, the parties shall meet and confer in order to attempt to come to an agreement on the amount that is recoverable. As part of the meet and confer process, Plaintiffs' counsel shall provide all documentation relating to the attorneys' fees, expenses, and costs being claimed.

## XIX.   RESERVATION OF JURISDICTION AND ENFORCEMENT

The parties consent to the reservation and exercise of jurisdiction by the District Court over all disputes between and among the parties arising out of this Amended Consent Decree. Defendants will not assert, after the final approval by the District Court of the Amended Consent Decree, that the District Court lacks the authority to enforce the terms of this Amended Consent Decree, or raise any jurisdictional defense to any enforcement proceedings permitted under the terms of this Amended Consent Decree.

If Class Counsel believes the Defendants are violating any provision of this Consent

[3284355.3]

Decree, they shall first meet and confer in good faith with Defendants to attempt to remedy the claimed violation, as set forth below.  If the meet and confer efforts fail, Class Counsel may file a motion with the District Court to seek an order that the Defendants are not in substantial compliance with the Amended Consent Decree.  In the event the District Court finds that Defendants have not substantially complied with the Amended Consent Decree, it shall in the first instance require Defendants to submit a plan for approval by the District Court to remedy the deficiencies identified by the District Court.  In the event the District Court subsequently determines that the Defendants' plan did not remedy the deficiencies, the District Court shall retain the power to enforce this Amended Consent Decree through all remedies provided by law.

The District Court shall retain jurisdiction to enforce the terms of this Amended Consent Decree through specific performance and all other remedies permitted by law or equity.

The District Court shall be the sole forum for the enforcement of this Amended Consent decree.  Any order to achieve substantial compliance with the provisions of this Amended Consent Decree shall be subject to the applicable provisions of the Prison Litigation Reform Act, 18 U.S.C. § 3626.

As identified above, the parties are required to meet and confer prior to involving the District Court in any dispute.  If Class Counsel believes that Defendants are not substantially complying with any of the acts required by this Amended Consent Decree they shall notify Defendants in writing of the facts supporting their belief.  Defendants shall investigate the allegations and respond in writing within 30 days.  If Class Counsel are not satisfied with Defendants' response, the parties shall conduct negotiations to resolve the issue(s).  If the parties are unable to resolve the issue(s) satisfactorily, either party may move the District Court for any relief permitted by law or equity.  In cases of particular urgency that are central to the purpose of the Amended Consent Decree, a party may opt to bring disputes directly to the District Court.

[3284355.3]

1       This Amended Consent Decree may be enforced only by the parties hereto.

2   Nothing contained in this Amended Consent Decree is intended or shall be construed to

3   evidence of an intention to confer any rights or remedies upon any person other than the

4   parties hereto.

5   **XX.   TERMINATION**

6       The duration of the Amended Consent Decree is four (4) years from the date this

7   Amended Consent Decree is entered by the District Court.  If at the end of the four-year

8   period Plaintiffs claim Defendants are not in substantial compliance with this Agreement,

9   they shall bring a motion with the District Court to extend the time limitation on this

10  Amended Consent Decree.  Prior to bring such a motion, the parties shall meet and confer

11  in good faith an attempt to resolve the issues.

12      Defendants shall not file a termination motion pursuant to 18 U.S.C.

13  § 3625(b)(1)(A)(i) for two (2) years from the date this Amended Consent Decree is entered

14  by the District Court.  Any termination motion shall be based on a record of no less than

15  one year of substantial compliance with all the requirements of this Amended Consent

16  Decree.  Prior to bringing a motion to terminate, the parties shall meet and confer in good

17  faith to reach a resolution of the issue.  As part of that process, if Plaintiffs intend to

18  contest the motion to terminate, the Plaintiffs shall specifically identify the areas they

19  claim Defendants are not in substantial compliance, and the evidence they claim supports

20  that position.  Defendants shall provide Class Counsel with notice of their intent to file a

21  motion to terminate at least 90 days prior to filing such motion.  The parties shall meet and

22  confer regarding a discovery plan and schedule in connection with any motion to terminate

23  filed by Defendants or motion to extend the term of the Amended Consent Decree filed by

24  Plaintiffs.

25  ///

26  ///

27  ///

28

1    Nothing in this Amended Consent Decree shall limit the parties' rights to challenge

2  or appeal any finding as to whether Defendants are not in substantial compliance with the

3  Amended Consent Decree or consequent orders entered by the District Court.

4

5    IT IS SO STIPULATED.

6

7  DATED: August 15, 2018           COURTNEY C. ABRIL
                                    County Counsel for Yuba County
8
                                    By:  _____
9                                        Courtney C. Abril

10

11  DATED: August 16 2018           PORTER SCOTT
                                    A Professional Corporation
12
                                    By: _____
13                                       Carl L. Fessenden

14                                  Attorneys for Defendants

15

16  DATED: August 10, 2018          ROSEN BIEN GALVAN & GRUNFELD LLP

17                                  By:  _____
                                         Gay Crosthwait Grunfeld
18

19  DATED: August 16, 2018          UC DAVIS CIVIL RIGHTS CLINIC

20
                                    By:  _____
21                                       Carter C. White

22                                  Attorneys for Plaintiffs

23

24

25  ///

26  ///

27  ///

28
                                     71

[3284355.3]

1

**[PROPOSED] ORDER**

2       The Parties are currently bound by a consent decree approved by the Court in May

3   1979. In July 1976, the Court certified a class consisting of all "all persons incarcerated

4   within the Yuba County Jail."  The Parties now wish to amend the current Consent Decree.

5   The Parties have met and conferred extensively to review and discuss claims relating to the

6   conditions of confinement at the Yuba County Jail and access to its programs, services and

7   activities under the Americans with Disabilities Act and changes to the existing Consent

8   Decree.  The process has included six days of face-to-face meetings overseen by Judge

9   Kendall Newman.  Based on a review of the entire record, including the matters set forth in

10  the Stipulated Amended Consent Decree, and considering the procedural and factual

11  circumstances of this case, the Court finds good cause to enter the following Order:

12       1.       The Court accepts and adopts the statements, terms, and conditions set forth

13  in the Parties' stipulated Amended Consent Decree;

14       2.       Under the circumstances presented in this matter, the Court finds such relief

15  is narrowly drawn, extends no further than necessary to correct the violation of the Federal

16  rights, and is the least intrusive means necessary to correct the violation of the Federal

17  rights.

18       3.       This Court has jurisdiction over the subject matter in this litigation and over

19  all the parties to this action, including all members of Plaintiffs' class.

20       4.       This case shall remain open and the Court shall retain jurisdiction to enforce

21  the terms of the Amended Consent Decree for the terms and under the conditions set forth

22  in section XX – Termination of the Amended Consent Decree.  Once the matter is

23  terminated under that provision, this case shall be ordered dismissed, with prejudice.

24       5.       This matter will be transferred and assigned for all purposes to the

25  undersigned magistrate judge who, as set forth herein, shall make all rulings and decisions

26  in this case.  If the matter is not assigned to Judge Edmund F. Brennan, or he later becomes

27  unable to handle this case, the matter shall revert back to the assigned District Court judge,

28

[3284355.3]

1 | the Honorable John A. Mendez.

2 |      6.     This Order shall apply to Defendants, their agents, employees, and

3 | successors in office.

4 |      **IT IS SO ORDERED.**

5 | DATED: _____, 2018

6 |

7 |

8 |                        EDMUND F. BRENNAN
                       United States Magistrate Judge

[3284355.3]

# Exhibit A

**EXHIBIT A**

**Schedule for Exercise Roof**

|  | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| **0500-0605** | Q-1 | R-Dorm | H-Tank | I-Tank | T-Tank | S-3 & 4 | S-1 |
| **0610-0715** | Q-2 | Q-4 | T-Tank | J-Tank | G-Tank | S-5 & 6 | S-2 |
| **0720-0825** | Q-3 | Q-1 | S-1 | Q-1 | H-Tank | P-Tank | S-3 & 4 |
| **0830-0935** | S-1 | Q-2 | S-2 | Q-2 | I-Tank | R-Dorm | S-5 & 6 |
| **0940-1045** | S-2 | Q-3 | S-3 & 4 | Q-3 | J-Tank | Q-4 | K-Tank |
| **1050-1155** | S-3 & 4 | S-1 | S-5 & 6 | K-Tank | K-Tank | T-Tank | L-Tank |
| **1215-1320** | S-5 & 6 | S-2 | Q-4 | L-Tank | L-Tank | G-Tank | N-Tank |
| **1325-1430** | G-Tank | S-3 & 4 | Q-1 | N-Tank | N-Tank | H-Tank | P-Tank |
| **1435-1540** | H-Tank | S-5 & 6 | Q-3 | P-Tank | Q-1 | I-Tank | R-Dorm |
| **1545-1650** | I-Tank | T-Tank | R-Dorm | S-1 | Q-2 | J-Tank | Q-4 |
| **1710-1815** | J-Tank | H-Tank | G-Tank | S-3 & 4 | Q-3 | Q-1 | T-Tank |
| **1820-1925** | K-Tank | G-Tank | P-Tank | S-2 | S-1 | Q-2 | Q-1 |
| **1930-2035** | L-Tank | I-Tank | N-Tank | S-5 & 6 | S-2 | Q-3 | Q-2 |
| **2040-2145** | N-Tank | J-Tank | L-Tank | R-Dorm | S-3 & 4 | S-1 | Q-3 |
| **2150-2255** | P-Tank | K-Tank | Q-2 | Q-4 | S-5 & 6 | S-2 | FLEX |

**EXHIBIT A**

## Schedule for Exercise Yard

|  | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
|---|---|---|---|---|---|---|---|
| **0500-0600** | A Blk 1 & 2 | A Blk 7 & 8 | A Blk 9 & 10 | F-Evens | E-Evens | D-Evens | FLEX |
| **0605-0705** | A Blk 3 & 4 | A Blk 9 & 10 | A Blk 11&12 | F-Odds | E-Odds | D-Odds | Med 1 & 2 |
| **0710-0810** | A Blk 5 & 6 | A Blk 11&12 | A Blk 13&14 | D-Odds | B-Pod | E-Evens | Med 3 & 4 |
| **0815-0915** | A Blk 7 & 8 | A Blk 13&14 | A Blk 1 & 2 | B-Pod | Med 5 & 6 | E-Odds | Med 5 & 6 |
| **0920-1020** | A Blk 9 & 10 | A Blk 1 & 2 | A Blk 3 & 4 | C-Pod | Med 1 & 2 | F-Evens | E-Evens |
| **1025-1125** | A Blk 11&12 | A Blk 3 & 4 | A Blk 5 & 6 | D-Evens | Med 3 & 4 | F-Odds | E-Odds |
| **1145-1245** | A Blk 13&14 | A Blk 5 & 6 | A Blk 7 & 8 | A Blk 1 & 2 | D-Evens | Med 1 & 2 | F-Evens |
| **1250-1350** | B-Pod | F-Evens | B-Pod | A Blk 3 & 4 | D-Odds | Med 3 & 4 | F-Odds |
| **1355-1455** | C-Pod | F-Odds | E-Evens | A Blk 5 & 6 | C-Pod | Med 5 & 6 | A Blk 7 & 8 |
| **1500-1600** | D-Evens | B-Pod | E-Odds | A Blk 7 & 8 | A Blk 1 & 2 | A Blk 9 & 10 | A Blk 9 & 10 |
| **1605-1705** | D-Odds | C-Pod | Med 1 & 2 | A Blk 9 & 10 | A Blk 3 & 4 | A Blk 11&12 | A Blk 11&12 |
| **1725-1825** | E-Evens | D-Odds | Med 3 & 4 | A Blk 11&12 | A Blk 5 & 6 | A Blk 13&14 | A Blk 13&14 |
| **1830-1930** | E-Odds | D-Evens | Med 5 & 6 | A Blk 13&14 | A Blk 7 & 8 | A Blk 1 & 2 | A Blk 1 & 2 |
| **1935-2035** | Med 1 & 2 | Med 3 & 4 | F-Evens | Med 5 & 6 | A Blk 9 & 10 | A Blk 3 & 4 | A Blk 3 & 4 |
| **2040-2145** | Med 3 & 4 | Med 5 & 6 | F-Odds | Med 1 & 2 | A Blk 11&12 | A Blk 5 & 6 | A Blk 5 & 6 |
| **2150-2250** | Med 5 & 6 | Med 1 & 2 | C-Pod | Med 3 & 4 | A Blk 13&14 | A Blk 7 & 8 | FLEX |

3243172_2.xls

# Exhibit B

| Area | # Accept | # Decline | Location | Start Time | End Time |
|------|----------|-----------|----------|------------|----------|
| A-1 | | | | | |
| A-2 | | | | | |
| A-3 | | | | | |
| A-4 | | | | | |
| A-5 | | | | | |
| A-6 | | | | | |
| A-7 | | | | | |
| A-8 | | | | | |
| A-9 | | | | | |
| A-10 | | | | | |
| A-11 | | | | | |
| A-12 | | | | | |
| A-13 | | | | | |
| A-14 | | | | | |
| A-15 | | | | | |
| A-16 | | | | | |
| A-17 | | | | | |
| A-18 | | | | | |
| A-19 | | | | | |
| A-20 | | | | | |
| B | | | | | |
| C | | | | | |
| D-EV | | | | | |
| D-OD | | | | | |
| E-EV | | | | | |
| E-OD | | | | | |
| F-EV | | | | | |
| F-OD | | | | | |
| G | | | | | |
| H | | | | | |
| I | | | | | |
| J | | | | | |
| K | | | | | |
| L | | | | | |
| M-1 | | | | | |
| M-2 | | | | | |
| M-3 | | | | | |
| M-4 | | | | | |
| M-5 | | | | | |
| M-6 | | | | | |
| N | | | | | |
| P | | | | | |
| Q-1 | | | | | |
| Q-2 | | | | | |
| Q-3 | | | | | |
| Q-4 | | | | | |
| Q-5 | | | | | |
| R | | | | | |
| S-1 | | | | | |
| S-2 | | | | | |
| S-3 | | | | | |
| S-4 | | | | | |
| S-5 | | | | | |
| S-6 | | | | | |
| T | | | | | |

# Exhibit C

**Minimum Staffing Pattern**

| Position | SUN | MON | TUE | WED | THU | FRI | SAT | Total Hours | FTEs | Facility |
|---|---|---|---|---|---|---|---|---|---|---|
| **Yuba County, CA** <br> **Adult Staffing Plan - ADP 385** | | | | | | | | | | |
| | | | **Scheduled Hours** | | | | | Total Hours | FTEs | Facility |
| **Day Shift** | | | | | | | | | | |
| HSA/RN | | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | | 40.0 | 1.00 | Adult |
| Weekend RN sick call | 8.0 | | | | | | 8.0 | 16.0 | 0.40 | Adult |
| RN | | 8.0 | | 8.0 | | 8.0 | | 24.0 | 0.60 | Adult |
| LVN | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 56.0 | 1.40 | Adult |
| Clerk | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 56.0 | 1.40 | Adult |
| **Evening/Night Shift** | | | | | | | | | | |
| RN | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 56.0 | 1.40 | Adult |
| LVN | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 56.0 | 1.40 | Adult |
| **Night Shift** | | | | | | | | | | |
| RN | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 56.0 | 1.40 | Adult |
| LVN | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | 56.0 | 1.40 | Adult |
| **Medical and Mental Health Providers** | | | | | | | | | | |
| Medical Director | | 3.0 | | 3.0 | | 3.0 | | 9.0 | 0.23 | Adult |
| PA/FNP | | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | | 40.0 | 1.00 | Adult |
| On-site Psychiatrist | | 8.0 | | | | | | 8.0 | 0.20 | Adult |
| Telepsych | | | 8.0 | 8.0 | | | | 16.0 | 0.40 | Adult |
| MFT/LCSW | | 8.0 | 8.0 | 8.0 | 8.0 | 8.0 | | 40.0 | 1.00 | Adult |
| MFT/LCSW | 8.0 | | | 8.0 | 8.0 | 8.0 | 8.0 | 40.0 | 1.00 | Adult |
| Totals | | | | | | | | 569.0 | 14.23 | |

# Exhibit D

**CMGC**
Correctional Medical Group
C O M P A N I E S

# Medical Intake Triage/Receiving Screening

Translation Required?   Yes   No      Language?

| | |
|---|---|
| Date:          Time: | Name: |
| ALLERGIES: | BOOKING #:                    DOB: |
| Arrest Date: | Sex:   M          F |
| Previous Incarceration:  Yes    No | When?              Where? |
| Health Insurance?  Yes    No | Work Related Injuries?   Yes   No |

| **VITALS** | BP | PULSE | RESP: | TEMP: | SPO2: | HEIGHT | WEIGHT | Blood Sugar |
|---|---|---|---|---|---|---|---|---|
| | | | | | | ACTUAL / STATED | ACTUAL / STATED | *If Indicated* |

| | |
|---|---|
| **CURRENT MEDICAL COMPLAINTS & CONDITIONS** | *(NOTE: INCLUDE CURRENT SYMPTOMS; ANY E.D. VISIT, ACUTE INFECTION, OR TRAUMA IN PAST WEEK)* |
| | |
| | |
| | |
| | |
| | |

**MEDICATIONS**

*CURRENT MEDICATIONS:  YES   NO  (IF YES, VERIFY AND REFER TO PROVIDER)  INCLUDE PSYCHOTROPICS*

| MEDICATION NAME | DOSAGE | FREQUENCY | LAST USE | PHARMACY | CURRENT RX |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

MEDICATIONS VERIFIED:      YES       NO    EXPLAIN:

MAR TRANSCRIBED:      YES       NO

CURRENT MD CARE?

MEDICATION ALLERGIES?

OTHER ALLERGIES?

**MEDICAL HISTORY**

*PAST/PRESENT MEDICAL PROBLEMS (I.E. HEART PROBLEMS/SEIZURES, ETC.)*

HOSPITALIZATIONS:  YES  NO

RECENT TRAUMA WITH LOC W/I PAST 24-48 HOURS:  YES   NO

PAST/PRESENT POSITIVE TB TEST?  YES    NO        IF YES, WHEN?              TX/CXR?

PAST INFECTIOUS DISEASE?  YES  NO                      PPD Placed:    Yes    No

INTERNATIONAL TRAVEL?  YES  NO            WHERE?                    WHEN?

| **CHRONIC SYMPTOMS (CHECK ALL THAT APPLY)** | ☐ CHRONIC COUGH | ☐ LOSS OF APPETITE | ☐ FATIGUE |
|---|---|---|---|
| | ☐ WEIGHT LOSS | ☐ NIGHT SWEATS | ☐ FEVER |
| | ☐ COUGHING BLOOD | ☐ CHILLS | ☐ WEAKNESS |
| | ☐ CHEST PAIN | ☐ OTHER | |
| **CHRONIC DISEASES (CHECK ALL THAT APPLY)** | ☐ INFECTIOUS DISEASES | ☐ STD | ☐ HIGH BLOOD PRESSURE |
| | ☐ HEPATITIS | ☐ HIV/AIDS | ☐ ASTHMA |
| | ☐ HEART DISEASE | ☐ SEIZURES | ☐ OTHER |

☐ DIABETES     ☐ IDDM  ☐ NIDDM       DATE & TIME LAST MEAL:

COMMENTS:

Revision Date: 5/12/2017

**SUBSTANCE USE/ABUSE**

| | |
|---|---|
| DOES THE PATIENT APPEAR TO BE UNDER THE INFLUENCE?     YES     NO | |

| | |
|---|---|
| HISTORY OF DRUG USE?     YES     NO | LIST: |

| | | |
|---|---|---|
| ROUTE: PO  IV  OTHER: | AMOUNT: | FREQ: | LAST USE: |

| | |
|---|---|
| HX OF W/D?   YES   NO | DESCRIBE: |

| | |
|---|---|
| HISTORY OF ALCOHOL USE?     YES     NO | TYPE |

| | | |
|---|---|---|
| AMOUNT: | FREQUENCY: | LAST USE: |

| | |
|---|---|
| HX OF W/D?   YES    NO | DESCRIBE: |

HAVE YOU INGESTED OR PLACED ANY MEDICATIONS/DRUGS INTO A BODY CAVITY?   YES     NO

CURRENTLY WITHDRAWING?   YES   NO     DESCRIBE:

| SYMPTOMS<br>(CHECK ALL THAT APPLY) | ☐ SHAKES | ☐ HALLUCINATIONS | ☐ DIAPHORETIC |
|---|---|---|---|
| | ☐ LETHARGIC | ☐ HYPERACTIVE | ☐ NAUSEA |
| | ☐ VOMITING | ☐ DIARRHEA | ☐ FLUSHED FACE |

*IF PATIENT WITHDRAWING OR POTENTIAL FOR WITHDRAWAL, FOLLOW APPROPRIATE WITHDRAWAL PROTOCOL*

USE OF TOBACCO PRODUCTS: YES  NO     ☐ CIGARETTES     ☐ CHEW     ☐ OTHER

**MENTAL HEALTH HISTORY**

| | | |
|---|---|---|
| MENTAL HEALTH HOSPITALIZATIONS?  YES  NO | # OF TIMES: | MOST RECENT: |

| | |
|---|---|
| WHERE: | REASON: |

PAST/PRESENT DX?

| | |
|---|---|
| OUTPATIENT TX OR MEDS?     YES          NO | WHERE? |

LAST VISIT?

COMMENTS:

| | |
|---|---|
| SUBSTANCE ABUSE TX?    YES          NO | WHERE? |

COMMENTS:

| | |
|---|---|
| HX OF ABUSE/VICTIMIZATION?     YES   NO | AGE? |

| TYPE? | ☐ PHYSICAL | ☐ PSYCH/EMOTIONAL | ☐ SEXUAL |
|---|---|---|---|
| | ☐ FINANCIAL | ☐ OTHER | |

| | |
|---|---|
| HX OF VIOLENT BEHAVIOR?     YES   NO | DESCRIBE: |

DOES THE PATIENT BEHAVIOR SUGGEST A DANGER TO SELF OR OTHERS?   YES   NO

**SUICIDE RISK ASSESSMENT & SCREENING**

| | |
|---|---|
| * BOOKING OFFICER REPORTS INMATE IS SUICIDAL:  YES   NO | * FAMILY/FRIENDS REPORT SUICIDE CONCERNS:  YES     NO |

| | |
|---|---|
| ** SUICIDE WATCH ON PRIOR INCARCERATIONS:      YES  NO | DESCRIBE: |

| | | |
|---|---|---|
| ** PRIOR IDEATION OR ATTEMPTS?   YES   NO | NUMBER OF TIMES: | WHEN (DATES): |

| | |
|---|---|
| MOST RECENT ATTEMPT? | HOW (WHAT METHOD)? |

* SUICIDAL NOW?   YES   NO   WHAT IS THE PATIENT REPORTING?

* CURRENT PLAN?   YES   NO   DESCRIBE:

HOMICIDAL NOW? YES   NO     DESCRIBE:

| | |
|---|---|
| SOCIAL SUPPORT SYSTEM?     YES          NO | HISTORY OF FAMILY/FRIENDS SUICIDE?     YES          NO |

| | |
|---|---|
| DESCRIBE? | DESCRIBE? |

| | |
|---|---|
| RECENT REJECTION/LOSS (6 MONTHS)     YES          NO | WORRIED ABOUT A MAJOR PROBLEM?     YES          NO |

| | |
|---|---|
| DESCRIBE? | DESCRIBE? |

| | |
|---|---|
| ** FEELINGS OF HOPELESSNESS/HELPLESSNESS:     YES   NO | ** FEELINGS OF GUILT/WORTHLESSNESS/SHAME  YES   NO |

| | |
|---|---|
| DESCRIBE? | DESCRIBE? |

| | | |
|---|---|---|
| ** SIGNS OF DEPRESSION     YES          NO | ANXIETY?   YES     NO | EMOTIONAL FLATNESS YES  NO |

** INCOHERENT OR STRANGE MANNER?  YES  NO     DESCRIBE:

* = High Risk for Potential Suicide     ** Requires further investigation by Mental Health

**PATIENT NAME:** **BOOKING #:**

## SIGNS OF TRAUMA/DESCRIPTION OF INJURIES/OBJECTIVE OBSERVATIONS

**PHYSICAL AND MENTAL HEALTH FINDINGS**

1. BRUISES:

2. CONTUSION/REDNESS:

3. LACERATIONS:

4. INCISIONS:

5. SORENESS:

6. SWELLING:

7. OTHER:

8. PAIN?  YES    NO        PAIN SCALE :        /10

9. LOC: A/O x      Pupils: ☐ Equal   Size: Lt:      Rt:      ☐ Reactive

DESCRIBE:



NON-VERBAL OBSERVATIONS:

| APPEARANCE | MOOD | AFFECT | SPEECH | HA | DELUSIONS | ACTIVITY | OTHER |
|---|---|---|---|---|---|---|---|
| ☐ NORMAL | ☐ DEPRESSED | ☐ NORMAL | ☐ NORMAL | ☐ VISUAL | ☐ PARONOIA | ☐ APPROPRIATE | |
| ☐ DIRTY | ☐ HAPPY | ☐ CONSTRICTED | ☐ SLURRED | ☐ AUDIO | ☐ GRANDEUR | ☐ INAPPROPRIATE | |
| ☐ DISHEVELED | ☐ ANGRY | ☐ BLUNTED | ☐ RAPID | ☐ TACTILE | ☐ PERSECUTORY | ☐ OTHER | |
| ☐ UNUSUAL | ☐ LABILE | ☐ FLAT | ☐ PRESSURED | | | | |

**DENTAL**

| DENTAL PROBLEMS:   YES    NO | DESCRIBE: |
|---|---|

PAIN?  YES      NO              /10 PAIN SCALE       ☐ CARIES                  ☐ DENTURES

COMMENTS:

SPECIAL DIET REQUIRED?   YES      NO        TYPE?

**PREGNANCY ASSESSMENT (FEMALES ONLY)**

| PREGNANT:   YES   NO | HCG:     NEG     POS | GRAVIDA: | PARA: |
|---|---|---|---|
| LMP: | FETAL MOVEMENT: YES  NO | BLURRED VISION:  YES   NO | ELEVATED BP:   YES    NO |
| HEADACHE:   YES    NO | WEIGHT LOSS:        YES  NO | EPIGASTRIC PAIN: YES   NO | EDEMA:           YES    NO |
| NAUSEA/VOMITING:  YES  NO | VAGINAL DISCHARGE: YES  NO | DESCRIBE: | |
| PRENATAL CARE:   YES    NO | PHYSICIAN/CLINIC: | LAST EXAM: | EDC: |
| SUBSTANCE ABUSE: YES  NO: | COMPLETE SUBSTANCE ABUSE SECTION OF THIS FORM | | METHADONE:  YES    NO |

COMMENTS:

PREGNANCY PROTOCOL INITIATED:   YES      NO

**ADA**

ASSISTIVE DEVICE:      YES      NO      ☐ CRUTCHES      ☐ CANE      ☐ WHEELCHAIR      ☐ WALKER      ☐ HEARING AID

CHECK ALL THAT APPLY:      ☐ GLASSES      ☐ CONTACTS      ☐ BRACES      ☐ PROSTHESIS      ☐ OTHER

DESCRIBE:

| | | |
|---|---|---|
| **PREA** | HISTORY OF SEXUAL VICTIMIZATION?      YES*      NO | HISTORY OF SEXUAL ABUSIVENESS?      YES*      NO |
| | *Complete Sexual Abuse/Abusiveness Assessment Form | |
| **DD** | INDIVIDUAL SLOW IN ANSWERING QUESTIONS?      YES*      NO | HAVING TROUBLE ANSWERING QUESTIONS?   YES*      NO |
| | STATES HE/SHE IS A SLOW LEARNER?      YES*      NO | * Assess further for possible Developmental Disability |
| **ADDITIONAL COMMENTS** | | |

STAFF SIGNATURE AND TITLE (DATA COLLECTION)          DATE AND TIME

| | | |
|---|---|---|
| **DISPOSITION BY RN OR ABOVE** | ☐ REFUSE PATIENT AND REFER TO ED FOR EVALUATION | ☐ MENTAL HEALTH (EMERGENT/CRISIS) |
| | ☐ MEDICAL PROVIDER REFERRAL (EMERGENT/URGENT) | ☐ NEXT MENTAL HEALTH CLINIC |
| | ☐ NEXT PROVIDER SICK CALL | ☐ ROUTINE PSYCHIATRIC EVALUATION |
| | ☐ ROUTINE CHRONIC CARE (WITHIN 5-7 DAYS) | ☐ ROUTINE MHP EVALUATION |
| | ☐ BEGIN W/D PROTOCOL (ETOH, OPIATE, BENZO, ETC.) | ☐ REFER TO CUSTODY/SECURITY FOR PREA CONCERNS |
| | ☐ ROI SIGNED/FAXED | ☐ REFER TO CUSTODY/SECURITY FOR ADA NEEDS |
| | ☐ REFER TO DENTAL | ☐ PATIENT INSTRUCTED ON HOW TO ACCESS HEALTHCARE |
| | ☐ OTHER | |
| | ☐ GENERAL POPULATION | ☐ SUICIDE WATCH |
| | ☐ SOBERING CELL | ☐ MEDICAL HOUSING |
| | ☐ OTHER | |

DISPOSITION MADE BY:

**STAFF SIGNATURE AND TITLE (MUST BE RN OR ABOVE)**          DATE AND TIME
☐ Telephone/Verbal Order

I, THE UNDERSIGNED, AFFIRM THAT THE ABOVE INFORMATION IS CORRECT TO THE BEST OF MY KNOWLEDGE.  IN ADDITION, I HAVE BEEN PROVIDED INFORMATION VERBALLY, AND IN WRITING ON HOW TO ACCESS MEDICAL, DENTAL, AND MENTAL HEALTH SERVICES AT THE FACILITY.

PATIENT SIGNATURE          DATE AND TIME
☐ CHECK HERE IF PATIENT UNABLE TO SIGN

# Exhibit E

## Yuba County Jail ADA Accessibility Remediation

| PHASE 1 | | | |
|---|---|---|---|
| **ITEM** | **LOCATION** | **COST** | **COMPLETION DATE** |
| 1 | Jail Visiting Entrance – 3 doors exceed maximum pressure to open | | 2017 |
| 3 | North Main Entrance tactile sign is missing | | 2017 |
| 6 | Jail Visiting Entrance – handrail not compliant | | 2017 |
| 20 | Basement Lobby Tactile sign missing | | 2017 |
| 24 | Basement Lobby – Tactile unisex sign on restroom | | 2017 |
| 26-31, 33-34 | Visiting Restrooms – both restrooms being made unisex, women's restroom  to be made accessible – these are men's room items that will not be done | | 2017 |
| 35 | Basement Lobby – Tactile unisex sign on restroom | | 2017 |
| 37 | Basement Lobby Restroom – Paper towel dispenser too high | | 2017 |
| 38 | Basement Lobby Restroom - Water and drain pipe under lavatory are not adequately insulated | | 2017 |
| 39 | Basement Lobby Restroom –Lavatory bowl too low – R&R lav | | 2017 |
| 40 | Basement Lobby – seat cover dispenser mounted too high | | 2017 |
| 42 | Basement lobby restroom – relocate grab bar | | 2017 |
| 44 | Basement lobby restroom – relocate grab bar | | 2017 |
| 45 | Basement lobby restroom – relocate grab bar | | 2017 |

| 46 | Inmate Intake Bay – add another handrail, right side of ramp | | 2017 |
| 60 | Women's R Pod – Non-compliant clearance at desk | | 2017 |
| 63 | Women's R Pod – Phone not compliant | | 2017 |
| 64 | A, D, E, F New Jail 2% of phones need volume control | Changes by County's telephone contractor. | 2017 |
| 71 | A, D, E, F New Jail - Phone not compliant | | 2017 |
| 74 | New Jail Visitation Area – 2% of phones require volume controls | Changes by County's telephone contractor. | 2017 |
| 76 | Medical Cells - Phone not compliant | | 2017 |
| 88 | Pod B & C New Jail – mirrors mounted too high | | 2017 |
| 89 | Basement Visitation Area – 1 visiting cubicle not compliant | | 2017 |
| 90 | New Jail Visiting – voice communication devices | | 2017 |
| 91 | New Jail Visiting – voice communication devices | | 2017 |

| PHASE 2 | | | |
|---|---|---|---|
| **ITEM** | **LOCATION** | **COMMENTS** | **COMPLETION DATE** |
| 2 | Jail Visiting Entrance – landing at entrance not compliant | $7,054.00 | 2018 |
| 53 | New Jail Intake Area – maneuvering space in front of toilet wrong | $2,900.00 | 2018 |

| 57 | Intake Area Restroom – toilet & bathing facility not compliant. | Shower will not be made accessible; inmates in wheelchairs will be provided showers in other, accessible locations if necessary.<br><br>Toilet has been determined to be accessible.  No further remediation required. | 2018 |
| New | Converting a cell in N Pod to an accessible cell and converting the shower in N Pod to an accessible shower. | Rough estimate, of $55,000 - $65,000 or more. | 2018 |

| PHASE 3 | | | |
|---|---|---|---|
| **ITEM** | **LOCATION** | **COMMENTS** | **COMPLETION DATE** |
| 77 | New Jail Medical Cells – shower stall not compliant | $1,346.00 | 2018-2019 |
| 78 | New Jail Medical Cells – rear grab bar missing | $458.00 | 2018-2019 |
| 79 | Medical Cells – toilet not compliant | $1,527.00 | 2018-2019 |
| 80 | New Jail Medical Cells – sink not compliant | $2,704.00 | 2018-2019 |
| 81 | New Jail Medical Cells – shower stall not compliant | $1,346.00 | 2018-2019 |
| 59 | Cells Q1/Q2 Old Jail – cells not compliant | $3,044.00 per cell (2 cells) – one by end of 2018 | 2018-19 |
| 62 | Women's Pod R, Old Jail – toilet & bathing facility not complaint | $30,543.00 | 2018-2019 |

| PHASE 4 |
|---|

| ITEM | LOCATION | COMMENTS | COMPLETION DATE |
|------|----------|----------|-----------------|
| 47 | Inmate Intake Bay – change of direction landing not compliant | Escort disabled inmates.<br><br>Vanir estimate: $67,066 | N/A |
| 55 | New Jail Intake Area – floor drain too steep | Fill gap.<br><br>Vanir estimate: $2,078 | N/A |
| 83 | Pods B & C, New Jail – showers not compliant | Accessible shower will be made in Pod B.<br><br>Vanir estimate: please see estimate for details.  Up to $31,279. | By 2021 |
| 86 | Pods B & C, New Jail – toilet compartment not compliant | <u>Accessible toilet will be made in Pod B</u><br><br>Vanir estimate: $16,091 (2 pods) | By 2021 |

*End*

# Exhibit F

**CMGC**
**Correctional Medical Group**
C O M P A N I E S

# INITIAL HEALTH ASSESSMENT - NCCHC
### History and Physical Examination

| Date: | Time: | | Name: |
|---|---|---|---|
| ALLERGIES: | | | Date of Birth: |
| Booking Date: | | | Sex:    M        F |
| Intake Screening Reviewed?    Yes    No | Interpreter Used?    Yes    No | | Language & Interpreter: |

### VITALS

| | BP | Pulse | Resp | Temp | SP02 | Height | Weight | Blood Sugar |
|---|---|---|---|---|---|---|---|---|
| | | | | | | *Actual/Stated* | *Actual* | *If indicated* |

### MEDICATIONS

**CURRENT MEDICATIONS INCLUDING PSYCHOTROPICS**

| MEDICATION NAME | DOSE | FREQUENCY | LAST USE | REASON |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

MEDICATION ALLERGIES?

OTHER ALLERGIES?

## HISTORY

### FAMILY HISTORY

Has any blood relation (parent, brother, sister, other) or husband or wife had (write in relationship next to item)

| RELATION | AGE | STATE OF HEALTH | IF DEAD, CAUSE? | AGE AT DEATH | YES | NO | (CHECK EACH ITEM) | RELATION(S) |
|---|---|---|---|---|---|---|---|---|
| Father | | | | | | | had Tuberculosis | |
| Mother | | | | | | | had Heart Disease | |
| Spouse | | | | | | | had Diabetes | |
| Brothers & Sisters | | | | | | | had Cancer | |
| | | | | | | | had Asthma | |
| | | | | | | | had Syphilis | |
| Children | | | | | | | had Seizures | |
| | | | | | | | had Mental Illness | |

### MEDICAL HISTORY

**HAVE YOU EVER HAD OR HAVE YOU NOW (CHECK ALL THAT APPLY)**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| No Significant Medical Hx | | Thyroid Problems | | Cyst | | Nerve Pain | |
| Diptheria | | Tuberculosis | | Cancer | | Alcohol Treatment | |
| Whooping Cough | | Asthma | | Rupture | | Drug Abuse Treatment | |
| Mumps | | Shortness of Breath | | Appendicitis | | Paralysis (inc. Infantile) | |
| Scarlet Fever | | Pain or Pressure in Chest | | Hemorrhoids/Rectal Disease | | Gastrointestional Disorder | |
| Rheumatic Fever | | Chronic Cough | | Kidney Stones | | Depression | |
| Head Injury | | Fast or pounding heart | | Blood in Urine | | Suicide Attempt | |
| Swollen or Painful Joints | | Jaundice/Hepatitis | | Frequent/Painful Urination | | Menstrual Disorder | |
| Breast Pain or Lump | | Gall Bladder Trouble | | Bone Deformity | | Bed Wetting | |
| Freq or Severe Headache | | Gall Stones | | Joint or other Deformity | | Skin Rash | |
| Eye Trouble | | High Blood Pressure | | Diabetes | | Poor Vision | |
| Ear Trouble | | Low Blood Pressure | | Venereal Disease | | Hearing Problem | |
| Sinusitis | | Tumor | | Seizures | | Head Lice | |
| Hay Fever | | Growth | | Loss of arm, leg, finger or toe | | Measles/Chicken Pox | |

| HOSPITALIZATIONS/ OPERATIONS | |
|---|---|
| | IF YES, DESCRIBE: |
| | WHEN?                          WHERE? |
| | Other significant conditions/operations? |
| | |
| | |

## SUBSTANCE ABUSE HISTORY

| TOBACCO USE | | ALCOHOL USE | | SUBSTANCE/DRUG ABUSE | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Do you smoke? | | Do you drink alcohol?   ☐ Yes   ☐ No | | Do you use drugs?   ☐ Yes   ☐No | | | | | |
| Current? | ☐ | Type? | | Injectable Drugs use? ☐ Yes   ☐ No | | | | | |
| Former? | ☐ | Last use? | | Last Use? | | | | | |
| Never? | ☐ | How much? | | Drug | How Often | How Much | Last Use | Route | Hx of WD |
| Amt      /packs/day | | How Often? | | Heroin | | | | | |
| How Long? | | Prior Treatment Program?  ☐ Yes      ☐ No | | Narcotics | | | | | |
| | | Ever had alcohol withdrawals, tremors, seizures, or DTs associated with stopping alcohol? ☐ Yes      ☐ No | | Benzodiazepine | | | | | |
| | | | | Cocaine/Meth | | | | | |
| | | If Yes, when? | | Other | | | | | |

## MENTAL HEALTH HISTORY

**NON-VERBAL OBSERVATIONS:**

| APPEARANCE | MOOD | AFFECT | SPEECH | HALLUCINATE | DELUSIONS | ACTIVITY | OTHER |
|---|---|---|---|---|---|---|---|
| [ ] NORMAL | [ ] DEPRESSED | [ ] NORMAL | [ ] NORMAL | [ ] VISUAL | [ ] PARANOIA | [ ] APPROPRIATE | |
| [ ] DIRTY | [ ] HAPPY | [ ] CONSTRICTED | [ ] SLURRED | [ ] AUDIO | [ ] GRANDEUR | [ ] INAPPROPRIATE | |
| [ ] DISHEVELED | [ ] ANGRY | [ ] BLUNTED | [ ] RAPID | [ ] TACTILE | [ ] PERSECUTORY | [ ] OTHER | |
| [ ] UNUSUAL | [ ] LABILE | [ ] FLAT | [ ] PRESSURED | | | | |

Do you have a history of a mental health disorder? ☐ Yes  ☐ No    Have you been diagnosed with schizophrenia?   ☐ Yes   ☐ No

Have you been diagnosed as bipolar?   ☐ Yes   ☐ No    Have you been diagnosed with major depression   ☐ Yes   ☐ No

Feeling hopeless/helpless? ☐ Yes ☐ No    Do you have thoughts about suicide? ☐ Yes ☐ No    Family/Friends hx of suicide? ☐ Yes ☐ No

Recent significant loss? ☐Yes ☐No    History of suicide attempt? ☐Yes  ☐ No   When?    Thinking of suicide now? ☐ Yes  ☐ No

History of Psychiatric Hospitalization?   ☐ Yes   ☐ No    History of Outpatient Therapy?   ☐ Yes   ☐ No

| Details: | Details: |
|---|---|
| ☐ Developmental Disability   ☐ History of Violence | ☐ History of Victimization    ☐ History of Sexual Abuse |

Comments:

## DENTAL

DENTAL PROBLEMS:   YES    NO    DESCRIBE:

PAIN?   YES    NO              /10 PAIN SCALE

SPECIAL DIET REQUIRED?   YES    NO    TYPE?

## FEMALES ONLY

| PREGNANT:      YES    NO | HCG:   NEG    POS | Gravida: | Para: |
|---|---|---|---|
| LMP: | Last Pap Smear? | | |
| Last Mammogram? | Last Breast Exam? | | |
| Method of Birth Control? | | | |
| Vaginal discharge? | | | |

## ADA

| ASSISTIVE DEVICE:    YES    NO | ☐ CRUTCHES | ☐ CANE | ☐ W/C | ☐ WALKER | ☐ HEARING |
|---|---|---|---|---|---|
| CHECK ALL THAT APPLY: | ☐ GLASSES | ☐ CONTACTS | ☐ BRACES | ☐ PROSTHESIS | ☐ OTHER |
| DESCRIBE: | | | | | |



**CMGC**
**Correctional Medical Group**
C O M P A N I E S

### INITIAL HEALTH ASSESSMENT - Physical Examination

Patient Name: _____                Booking #: _____

## GENERAL OBSERVATIONS

| Acute Distress? ☐ Yes ☐ No | Dehydrated? ☐ Yes ☐ No | Mobility Restrictions? ☐ Yes ☐ No |
|---|---|---|
| Describe: | Describe: | Describe: |

## PHYSICAL EXAMINATION

| **Visual Acuity (Snellen)** | | | | **Head/Eye** | | Describe: |
|---|---|---|---|---|---|---|
| Completed? ☐ Yes ☐ No | | | | ☐ Unremarkable | ☐ PERRLA | |
| Without Correction: | R: | L: | Both: | ☐ Contusions | ☐ Pale Conjunctiva | |
| With Correction: | R: | L: | Both: | ☐ Lacerations | ☐ Sclera Icteric | |

| **Oral Cavity** | | Describe: | **Hearing** | | Describe: |
|---|---|---|---|---|---|
| ☐ Unremarkable | ☐ Lesions | | ☐ Appears Adequate | | |
| ☐ Dry Membranes | ☐ Pharyngitis | | ☐ Hearing Diminished | | |
| ☐ Thrush | ☐ Tonsillitis | | ☐ Deaf | | |
| ☐ Abscess | ☐ Other | | ☐ Other | | |

| **Neck** | | Describe: | **Chest** | | Describe: |
|---|---|---|---|---|---|
| ☐ Unremarkable | ☐ Other | | ☐ Major Surgical Scar | | |
| ☐ Appears Asymmetrical | | | Lungs Clear ☐ Yes ☐ No | | |
| ☐ Obvious Masses | | | ☐ Wheezes ☐ Rales ☐ Rhonchi | | |

| **Breasts** | | Describe: | **Heart** | | Describe: |
|---|---|---|---|---|---|
| ☐ N/A | ☐ Deferred | | Rate: ☐ Normal ☐ Brady ☐ Tachy | | |
| ☐ Performed | ☐ Other | | Rhythm: ☐ Regular ☐ Irregular | | |
| | | | Possible Murmur: ☐ Yes ☐ No | | |

| **Abdomen** | | Describe: | **Extremities** | | Describe: |
|---|---|---|---|---|---|
| ☐ Unremarkable/Soft | ☐ Liver Enlarged | | ☐ Unremarkable | ☐ Cyanosis | |
| ☐ Tender | ☐ Other | | ☐ Grip Strength Equal | ☐ Other | |
| ☐ Possible Mass | | | ☐ Edema | | |

| **Skin** | | Describe: | Please note: If patient's age, sexual history, medical history (past or present) indicate the need for a pelvic, rectal, genitalia, or prostrate exam, schedule patient for provider evaluation. |
|---|---|---|---|
| ☐ Unremarkable | ☐ Surgical Scars | | |
| ☐ Rash | ☐ Tattoos | | |
| ☐ Skin Abscess | ☐ Tracks | | |
| ☐ Abrasion | ☐ Other | | |

## HEALTH EDUCATION

| ☐ Oral Hygiene | ☐ Nutrition | ☐ Sexually Transmitted Diseases | ☐ Substance Abuse |
|---|---|---|---|
| ☐ Exercise | ☐ Tobacco Cessation | ☐ HIV Testing | ☐ Other |

## RECOMMENDATIONS/REFERRALS

| Clinic Referrals: | Work Restrictions: |
|---|---|
| Other: | |

_____
Signature and Title of Nurse

_____
Date and Time

_____
Signature of Reviewing Provider
Revised 01/03/2017

_____
Date and Time

# Exhibit G

**Quarterly Document Production**

- Current Special Attention Inmate Log

- A point in time snapshot list of inmates with disabilities generated on the first day of each month within the quarter

- All Incident Reports, with PREA Reports marked "Confidential and Subject to the Protective Order"

- End-of-Shift Reports

- Check Sheets prepared by the County and CFMG for following cells: Safety/Isolation Cells; Sobering Cells; Holding Cells; Step Down Cells

- Exercise Yard Logs

- Sick Call Logs for the 2d, 5th, 13th, 14th, 18th, 24th, 26th, and 30th of each month

- Quarterly Analysis for QA Meetings

- CFMG Staffing Reports created for the county, if any

- Random Selection of Monthly Intake Health Screenings consisting of 10% of all forms completed each quarter, unless Plaintiffs make a showing that an additional number shall be produced for a certain month.

- All non-confidential or non-attorney-client Death in Custody Reports and Morbidity & Mortality Reports and meeting minutes

- All non-confidential or non-attorney-client privileged Quality Assurance and/or Quality Improvement documents, if provided to the county, that are related to the provision of health care in the Jail.  These may include CFMG morbidity and mortality reports.

- Monthly Statistical Report prepared by CFMG for Defendants, including health care activities occurring both inside and out of the facility and summarizing services by type and place performed, work hours by classification, and the status of any third-party cost recoveries, if provided to the county, in accordance with Paragraph 17 of Exhibit A to CFMG's Agreement with Defendants

- Complete set of all Policies updated within the last quarter for:  Yuba County Jail Manual; Yuba County Jail Handbook; and Yuba County Jail Medical Policies, Procedures, and Protocols

- Hallway Logs which show out-of-cell time for inmates in the following areas: A-Pod; S-Tank; M-Cells; Q-1; Q-2; Q-3; Safety Cells; Holding Cells

- Logs of all prisoners found incompetent to stand trial showing how long they have been at the Jail

- Teletypewriter (TTY), SLI and Foreign Language Logs

- A monthly point in time snapshot list of inmates placed in Administrative Segregation during the quarter generated on the first day of each month in the quarter

- Classification Reports from 25% of inmates placed in Administrative Segregation during the quarter

- 25% of clearance forms received by CFMG from Rideout or other local hospitals allowing the return of inmates to the jail after emergency treatment

- Referral Forms generated by CFMG when transferring inmates to an inpatient psychiatric or other mental health facility or local hospital for emergency or mental health care

- Documents reflecting the involuntary administration of psychotropic mediations

- 25% of logs documenting CFMG Mental and Medical Health Rounds in Administrative Segregation, unless Plaintiffs make a showing that an additional number shall be produced for a certain month

- A list of all inmates referred to tele-psychiatry

- TB Tracking logs and results of positive results reported to Public Health TB control

- Reports of Error in End of Shift Narcotics Count Forms